DAN STAVINS, Plaintiff-Appellee, *v.* EUNICE STAVINS *et al.*, Defendants-Appellants.

First District (4th Division)   No. 78-118

Opinion filed March 29, 1979.

Kenneth S. Rosenblum and James A. Smith, both of Chicago, for appellants.

Beryl A. Birndorf, of Chicago, for appellee.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant Eunice Stavins appeals from a judgment of the circuit court of Cook County declaring void a conveyance to her of a half interest in the marital home from her ex-husband, Dan Stavins, the plaintiff. On appeal, the defendant argues the conveyance was a valid gift and seeks reversal of the trial court. The plaintiff contends the gift was void because it was induced by moral duress.

The parties were married in 1953. They have four children, three of whom were minors living with the defendant at the time of this action. They were divorced in December 1973. The settlement agreement provided each party would receive a half interest in the marital home.

Custody of the children was given to the defendant. The defendant continued to reside in the marital home with the minor children after the divorce. The plaintiff was required to pay child support, a lump sum in lieu of alimony, and the children's educational and medical expenses. At the time of the disputed transaction, the plaintiff lived in a one-bedroom apartment with his second wife.

On March 23, 1977, the defendant attempted suicide by taking an overdose of pills. On March 24, 1977, the plaintiff was informed that the defendant had attempted to take her own life because she had misappropriated more than $15,000 from her employer. The plaintiff testified that he had a conversation with the defendant on the day after the suicide attempt at their marital home. The parties' three minor children and a woman named Sheila Levin were also present. The defendant told the plaintiff that she could no longer provide for the children and that the plaintiff should take the children. She said she would move out of the house, leaving it to him. She told the plaintiff that her only concern was to repay the money she had embezzled; that she wanted to save herself and the children from embarrassment. The plaintiff told the defendant that he could not make any decision without consulting his present wife; that he could not take the children into his one-bedroom apartment; and that he would not move back into the marital home against his present wife's wishes.

The plaintiff admitted in a deposition that on the day after the suicide attempt he told the defendant there was a possibility he could give her his half interest in the house. However, when he testified in court he denied making such an offer. The plaintiff was asked if the defendant demanded or requested his interest in the house. The plaintiff responded:

"She suggested that there's only one thing she's interested in, and that's the embezzlement money to Burt's, and that she wants—I think the inference was there—that she would want my share of the equity. Maybe she didn't come out directly and say that to me, but, I think, the inference was there."

When he signed a blank quitclaim deed he understood he was giving up his interest in the house.

The plaintiff also testified he had not discussed the possible conveyance of his half interest in the house with an attorney at the time he signed the blank documents. He said he never intended to make a gift of the house to the defendant. The plaintiff testified that the defendant brought a quitclaim deed to him at his office two or three days after the suicide attempt and that he signed the blank form. A week or more later a document was mailed to his office, addressed to the defendant. The plaintiff had his son give this envelope to the defendant. A day or two later, the defendant appeared at the plaintiff's office again and asked him

to sign a blank assignment form. The document, which assigned the plaintiff's interest in the house to the defendant, was introduced into evidence. The plaintiff said his understanding was that the defendant's sole purpose for wanting the house was to repay the embezzled funds.

Sheila Levin's description of the conversation was essentially the same as the plaintiff's, except that she said the plaintiff told the defendant he could help by giving her his interest in the house. The plaintiff told the defendant it would be fine if she could repay him and, if not, that it did not matter. The witness was present when the quitclaim deed was signed, and the plaintiff said he was signing the paper to help the defendant with her financial problems.

Robert Stavins, a son of the parties, testified that during the conversation between the parties they stated:

"So, they were tossing around what to do, and they came upon financing the home, and my father had said, 'I'll give you my half of the home, I just want the children to be happy,' and my mother had said, 'Thank you, if I ever can repay you, I will,' and my father said, 'I don't want anything, I want the children to be happy; you keep the house.' "

Robert also said he overheard a telephone conversation which the plaintiff had with his attorney, Miles Beerman, two or three days after the suicide attempt. The plaintiff told Robert that he was going to call Beerman to ask him for advice. Robert heard his father say, "I know, Miles, legally speaking I'm an idiot, but do it anyway. Keep it quiet."

The defendant testified the plaintiff offered to help by giving her his half interest in the house. She told the plaintiff she wanted to repay the embezzled funds to her employer. She denied threatening to attempt suicide again if the plaintiff refused to transfer the property. She denied demanding or requesting that he transfer the property. The quitclaim deed was filled in before she obtained the plaintiff's signature. The plaintiff signed the form and then suggested that she go to the Lincolnwood Bank where Marvin Schneider could advise her. The plaintiff called Schneider to inform him that the defendant was on her way. At the Lincolnwood Bank the defendant discovered that the quitclaim deed was useless because the house was in trust. She asked the Northwest National Bank to mail her an assignment of beneficial interest form. The form was mailed to the plaintiff's office and a week later she went to that office, filled out the form, and had the plaintiff sign the completed form.

The defendant also testified that the embezzled money went toward the living expenses of her family. Between January 1976 and March 1977, the defendant went to Las Vegas half a dozen times. Each trip lasted three to five days. She paid her own expenses for the trips and while there

she gambled. Her gambling gains exceeded her losses for 1976 but she did not report the gains on her Federal income tax return for that year.

The court found that the elements of a gift were present, but that it would be tantamount to a fraud to permit the gift to stand because the defendant was incapable of managing her financial affairs. Therefore, the court held the conveyance void.

The complaint sought to void the transaction on the basis of fraud. On appeal, the plaintiff abandons the fraud theory and argues that moral duress was proved at the trial and that the transaction should be void on that basis. The defendant argues moral duress has not been established.

The plaintiff contends he was confronted with three alternatives by the defendant on March 24, 1977: (1) that the defendant would kill herself; (2) that she would go to jail; or (3) that she would abandon their minor children. The plaintiff submits that if any of these three events occurred, the plaintiff would have had to assume the care and custody of the three minor children. He concludes that he has thereby shown moral duress because the "[d]efendant confronted him with a situation from which his only escape was to offer to transfer to defendant his undivided one-half beneficial interest in [the house]."

Moral duress has been defined as including "imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another, whereby his free agency is overcome." (*Pittsburgh Steel Co. v. Hollingshead & Blei* (1916), 202 Ill. App. 177, 181.) A more recent case has noted in connection with moral duress that "[i]n all of the cases we have read * * *, the conduct of the party obtaining the advantage is itself tainted with some degree of fraud or wrongdoing." *Borgeson v. Fairhaven Christian Home* (1971), 1 Ill. App. 3d 323, 326, 272 N.E.2d 436, 438.

■■ A description of duress which we find more helpful was set forth by the Illinois Supreme Court in *Stoltze v. Stoltze* (1946), 393 Ill. 433, 66 N.E.2d 424. The court wrote:

"Duress has been universally defined as a condition which exists where one is induced by the unlawful act of another to make a contract or perform or forego an act under circumstances which will deprive him of the exercise of his free will. There must be such compulsion affecting the mind as shows that the execution of the contract or other instrument was not the voluntary act of the maker. Such compulsion must be present and operate at the time the instrument was executed. The burden of proving such duress is on the person asserting it." *Stoltze*, 393 Ill. 433, 442, 66 N.E.2d 424, 428.

A reviewing court may substitute its judgment for that of the trier of fact where the lower court's judgment rested on unsatisfactory or

insufficient evidence. (*People v. Powell* (1978), 72 Ill. 2d 50, 377 N.E.2d 803.) The trial court's judgment here, which voided the plaintiff's conveyance of his interest in the marital home to the defendant, rested on insufficient evidence. We do not believe that the plaintiff has proved that the conveyance was unlawfully induced by moral duress. Even if the trier of fact chose believe only the plaintiff's testimony and not that of the defendant and her witnesses, the plaintiff's testimony did not establish moral duress.

The plaintiff's testimony indicated that the defendant did not ask for his interest in the house, much less demand it. He said, "I think the inference was there—that she would want my share of the equity. Maybe she didn't come out directly and say that to me, but, I think, the inference was there." While the plaintiff undoubtedly felt some "compulsion" to help his ex-wife and children out of their financial plight, there is no evidence that the defendant exerted unlawful or even wrongful pressure in order to achieve this result.

Furthermore, the plaintiff testified that he signed the quitclaim deed a day or two after the suicide attempt and signed the assignment form more than a week after that. He also said he understood when he signed the quitclaim deed that he was giving up his interest in the house. The time which elapsed between the suicide attempt and the signing of the forms gave the plaintiff ample opportunity to consider whether he wanted to relinquish his equity in the marital home. The plaintiff's testimony does not establish that at the time he signed the documents he was laboring under such a compulsion that the signing was not a voluntary act on his part. The burden in this case was on the plaintiff, and it has not been met. *Stoltze.*

The testimony of the defendant's witnesses gives further weight to the conclusion that no compulsion surrounded this conveyance. Sheila Levin, Robert Stavins and the defendant herself all testified that the idea of conveying the plaintiff's half interest in the house originated with the plaintiff himself, and not with the defendant. Additionally, Robert Stavins testified that the plaintiff told his attorney that "legally speaking [I am] an idiot," and that this conversation occurred before the forms were signed. This constitutes further evidence from which we may infer that the conveyance was a wholly voluntary and deliberate action, untainted by any unlawful duress on the part of the defendant.

For the foregoing reasons the judgment of the circuit court of Cook County is reversed.

Judgment reversed.

JOHNSON and ROMITI, JJ., concur.