*In re* MARRIAGE OF EDWARD J. RICHARDSON, Petitioner and Counterrespondent-Appellee, and IRENE RICHARDSON, Respondent and Counterpetitioner-Appellant.

First District (6th Division) Nos. 1—90—3633, 1—91—1796,
1—91—3739 cons.

Opinion filed September 11, 1992.—Rehearing denied December 1, 1992.

Gary A. Weintraub, P.C., Diane M. Bruzas, and Jerome N. Zurla, Ltd., all of Chicago, for appellant.

Schiller, DuCanto & Fleck, of Chicago (Arnold B. Stein, Burton H. Hochberg, Sarane C. Siewerth, and Anita B. Ward, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner Edward J. Richardson (Edward) filed an action for declaratory judgment to determine the validity of a post-nuptial agreement (agreement) entered into between Edward and respondent Irene Richardson (Irene) on March 17, 1983. Among other provisions, the agreement addressed the distribution of marital assets including stock in Richardson Electronics to Edward, the award of the marital residence to Irene, and a two-year moratorium wherein Edward agreed not to file for dissolution of the marriage.

On November 23, 1987, Edward filed for dissolution of marriage and pled the existence, execution and validity of the agreement as dispositive of the rights of the parties. Irene contended that the agreement was invalid because it was based upon fraud and misrepresentation in the valuation of the assets listed on the balance sheet, and

fraudulently misrepresented the nature, content and subject matter of the agreement. In the interim, the marital residence awarded to Irene was found to be in need of significant structural repair totaling $400,000, which Edward was ordered to pay.

On December 4, 1990, the trial court entered a bifurcated judgment of dissolution of marriage dissolving the marriage between the parties, and found that the agreement was valid and enforceable. On May 20, 1991, the court entered a second judgment against Irene for reimbursement of the $400,000 expended by Edward for home repairs, which was secured by a lien against the marital residence awarded to Irene. Irene contends that the agreement is invalid as a matter of law or alternatively that the agreement should be set aside because it is unconscionable. Irene further advances the affirmative defenses of fraud, duress and coercion in connection with the execution of the agreement.

The parties were married on June 15, 1963, and had two children, Edward, Jr., and Patricia, both of whom are now adults. At the time of the marriage and for several years thereafter, both Edward and Irene were employed by Arthur H. Richardson, Inc., a closely held electronics distributing firm founded by Edward's father in 1947. Irene worked for the company as a secretary and bookkeeper, and also handled the accounts payable and customer relations.

All of the stock in the company was originally owned by Edward's parents. Arthur H. Richardson, Sr. (Arthur), held 13 shares, and 12 shares were held by Florence Richardson (Florence), Edward's mother. On June 19, 1974, the shares held by Arthur were redeemed by the corporation for $900,000. Upon Arthur's retirement, Edward became president, chief operating officer and sole shareholder of the corporation, while Irene functioned as its corporate secretary and treasurer. By 1980, Richardson Electronics, Ltd., its successor, had become a 35-employee firm that specialized in distributing electron tubes with yearly sales of $10 to $12 million, and stock with a book value of $6 million.

The record reveals that due to changes in the electronics industry, Edward became increasingly concerned about the company's ability to procure products to distribute. Two alternatives to this problem were contemplated: a merger with a larger manufacturer; or an outright sale to a larger company that would provide capital for diversification, acquisitions, or capital investments. In early 1980, an investment banking firm was contacted for the purpose of assisting in the sale of Richardson Electronics. Edward sought to market the company for a price of 10 times the company's fiscal 1980 earnings, or approxi-

mately $12 to $15 million. In December 1980, Bell Industries made a proposal for the acquisition of Richardson Electronics for $9.89 million plus a structured earn-out formula that would pay additional funds according to a formula based on a return on capital invested. According to Edward, the transaction was never consummated because the price offered was too low.

In 1981, Richardson Electronics acquired the assets of National Electronics and later merged with Centron Electronics in order to vertically integrate the firm and guarantee its customers' product supply. In March 1982, Richardson Electronics acquired the small power tube division of RCA.

In 1977, the parties purchased a residence in Barrington, Illinois for $400,000. One year later, the adjoining 12½-acre parcel was purchased for $117,000. Immediately after the purchase, the parties contracted to have the home extensively remodeled. At trial, Irene estimated the value of the house, land, and reconstruction at approximately $1 million.

During the course of the marriage, Edward also purchased an interest in several other pieces of property. Edward and his father each purchased a 50% interest in the Richardson Hunt Club, a 400-acre parcel of farmland upon which a lodge was built for business meetings and entertaining. In 1979 and 1980, Edward acquired Richardson Farms, a 160-acre hog-raising facility, for approximately $400,000.

Although the parties separated in 1980, Edward returned to the Barrington home during the spring of 1981 for a "trial period" of four to six weeks. Irene retained Bernard Rinella as legal counsel on December 16, 1980. Rinella spoke with Edward's corporate counsel, Scott Hodes, of the firm of Arvey, Hodes, Costello and Burman (Arvey), who asked him to hold off filing a petition for dissolution of marriage. Rinella and Hodes proceeded to conduct informal discovery, and Hodes produced data relating to the acquisition of the Barrington residence as well as income tax returns for the various business ventures engaged in by Edward.

In November 1981, Irene filed her petition for divorce which contained a list of 10 assets she identified as marital property, including Richardson Electronics and its New York subsidiary, Richardson Hunt Club, Richardson Farms, the Richardson Electronics building located in River Grove, and the Barrington residence. At trial, Rinella testified that he never valued the stock of Richardson Electronics because he had not completed discovery and did not have sufficient financial information to do so. On February 25, 1982, the divorce action was voluntarily dismissed by Irene. According to Irene, Edward asked her

to dismiss the divorce action because it was not good for him to have a divorce pending in light of his current business involvements. Edward testified that after discussing the various settlement terms, it was obvious that Irene did not want a divorce.

In the summer months of 1982, Irene and Edward met with another attorney, William G. Seils, also a member of the Arvey firm. Throughout the course of Seils's 26-year legal career, he had worked on matrimonial cases on only two occasions. Seils attended this meeting at the request of Hodes, who told Seils that Edward stated the parties had resolved their differences and had come to an agreement that they would like to have documented and proceed with the divorce. Hodes testified similarly that Edward had called and asked him to meet with them to discuss formalizing the agreement they had made regarding a division of their assets.

Following the meeting, Seils began preparing a draft agreement in October 1982. Irene was not represented by counsel at that time. In the initial drafts, Edward was to pay Irene $11,000-per-month maintenance and the parties were to have joint custody of their two children with Edward paying an additional $1,500 per month per child in child support. Irene was to receive the $1 million Barrington residence, and furnishings, with surround acreages, one-half of the hog farm, and her Mercedes automobile. The remaining property would be assigned according to title, with jointly held assets to be divided between the parties.

Over the course of the next several months, various modifications to the draft were made. Hodes told Edward that Irene would have to be represented by an independent attorney who would·review the agreement on her behalf. On February 17, 1983, Hodes contacted Muller Davis, a matrimonial law attorney. Hodes informed Davis that the agreement dealt with marital assets estimated between $15 to $20 million. Hodes also told Davis that Irene was anxious to get back together with her husband, and that Edward was willing to try and get back together again.

Davis met with Irene on February 23, 1983, to discuss the agreement. Irene informed Davis that her husband was in the electronics business and had assets worth $30 million. Irene and Davis also discussed whether part or all of the stock was marital. After the meeting, Davis informed Hodes that Irene was not getting what she expected out of the agreement. Davis further recommended that if the parties really wanted to reconcile, they should attend marital counseling.

In August 1982, Irene's father became ill and was diagnosed as suffering from lung and liver cancer. Over the course of the next several months, he was hospitalized much of the time. He died in March 1983. Bonnie Rapier, Irene's friend, testified that Irene was very involved in her father's illness and death, spent a great deal of time at the hospital, and that it was difficult to talk with her because she was so emotional. Ana Grember, another friend of Irene's, stated that Irene lamented she had lost her father-in-law, and now she was going to lose her father. Grember testified that Irene was also hoping she was not going to lose her marriage as well.

On March 7, 1983, Irene, Edward, Davis and Seils met at Davis' office for a conference. During that meeting, the parties' estate was said to have a value of $13 million gross, or $11 million net, and that Edward had yearly income of $235,000. Davis testified that Irene objected to the monetary part of the agreement. After reading through the agreement, Davis recommended that Irene refrain from signing it because it was not a good deal for her. Both Seils and Edward confirmed that Davis recommended against Irene entering into the proposed agreement at that meeting. Seils further testified that Irene stated that she did not want to get divorced and that she was crying and distraught at the meeting.

Following the March 7 meeting, Seils told Hodes that Irene had been "very upset," that she had been crying, and that she really did not want to be divorced from Edward. Similarly, Edward indicated that when he drove Irene home from the meeting she was crying and told him that she did not want a divorce. However, Edward stated that at the time of the meeting in Davis' office, there was no doubt in his mind that he would ultimately divorce Irene, and that he knew he "didn't want to live with this woman any longer."

Davis testified that Irene did not terminate the attorney-client relationship with him at any time on March 7. Irene also indicated that she did not officially discharge Davis by letter or telephone call. Davis never heard from Irene again. Seils testified that Edward called him and told him that Davis would no longer be representing Irene. Edward indicated to Seils that he had agreed with Irene to a moratorium to give them a chance to reconcile, and on that basis they were going ahead with the agreement dividing their property. However, another attorney would be representing Irene. According to Hodes, Davis called him after the meeting and told him that he didn't think he could represent Irene because the financial arrangement was not the key thing between these two parties; nevertheless, Davis never specifically said that he would not represent Irene.

Later that afternoon, Hodes referred Edward to another attorney, David Passman, who was a former associate at the Arvey firm. In turn, Edward recommended Passman to Irene. Hodes testified that he called Passman on the afternoon of March 7 and told him that the parties had reached an agreement in substance concerning the terms of their separation, but that Irene was not then represented by counsel. Hodes explained the major provisions of the agreement and told Passman that it was to be executed on March 11, 1983. Hodes stated that he told Passman that this was a matter that had to be dealt with quickly, per Edward's request, and that Edward would be paying Passman's fee. Passman agreed to take the case pending a conversation with Irene. Passman did not consider himself to be a matrimonial attorney, and he had never prepared a post-nuptial agreement from its inception.

Passman stated that Hodes initially contacted him on March 4, 1983. Passman was unaware that Davis had previously represented Irene in this agreement, and later testified that he would not have undertaken the representation of Irene had he known that she was represented by other counsel. Seils forwarded a copy of the proposed settlement agreement to Passman on March 7. The following morning, Passman went over the draft agreement with Seils over the telephone. Passman suggested that the following substantive changes be made: (1) specification of a time period for reimbursement of mortgage and real estate tax payments; (2) inclusion of a sentence providing that Edward would be responsible for any penalties/late charges on such mortgage and real estate tax payments if he did not pay them in a timely manner; and (3) adding a provision permitting Irene to sell or encumber the Barrington residence and her automobile. Seils also indicated that Passman requested changes in the paragraph providing for a new automobile, and the addition of a provision giving Irene the right to review any joint tax return.

On March 8 a second draft of the proposed agreement was delivered to Passman. At Passman's request, Seils also added language concerning real estate taxes, Irene's selection of a new Mercedes and right to sell the car, and estate rights of each party in case of the death of the other. Seils sent Passman a copy of the revised draft, and a copy of the March 1, 1983, balance sheet. On the following day, Passman wrote to Seils requesting two additional changes in the draft. Seils also shortened the moratorium on the divorce provision from four years to two years, as requested by Edward.

Passman further testified that he met with Seils on March 9, and that Seils provided him with an "inch or two of documents from

Richardson Electronics" including corporate balance sheets and financial statements. Passman spent approximately 20 minutes reviewing the financial information. Passman did not make any investigation as to whether the Richardson Electronics stock was marital or nonmarital, nor did he ask for any further documents or financial information to verify any of the entries on the balance sheet.

On March 10, Passman received a third draft of the proposed agreement from Seils which incorporated the latest changes Passman had requested. Seils sent back a final draft with the balance sheet and a cover letter confirming the four-way meeting scheduled for the following morning. However, the meeting did not take place because Irene's father died.

As a result of her father's death, Irene spent the following week attending his wake and preparing the funeral arrangements. According to Irene, Edward approached her at the wake and told her that because he wanted to build onto the Hunt Club property, he would exchange title to that property and give her the title to the marital residence in Barrington. Irene further stated that she and Edward agreed not to file for divorce for four years. Following the funeral, Edward told Irene that they would be a family again. Similarly, Irene's mother testified that Edward told her that they would soon be together again as a family.

On March 17, 1983, Edward drove Irene to Hodes' office. Irene testified that she believed the only purpose of the trip was to sign an exchange of titles on the house. Prior to the time Irene entered the car, she had not seen any document regarding the exchange of houses, nor had she seen any type of agreement. Edward told her that the transfer of title was in the best interest of the children so that she would not have any liabilities on the house that he was going to build.

After arriving at Hodes' office, Irene entered a conference room with Edward, Seils, Passman and a secretary. After introductions were made, Irene was informed that Passman was to be her attorney. Irene testified that she had never met, spoken to, or corresponded with Passman prior to this meeting. Irene testified that she was crying and that someone gave her some water. Irene was then given a pen and Seils told her to sign the agreement. Irene testified that no one explained or read the agreement or the attached balance sheet to her, and that she did not know what she was signing when she executed the agreement. She was not aware if any of the real estate properties had been appraised, nor did she recall seeing any financial information on the value of Richardson Electronics. Irene had no in-

dependent knowledge of the assets or liabilities listed on the balance sheet. The meeting lasted for approximately one hour, and Irene felt as though her "world was coming down around her." She could not comprehend the reason why the agreement had to be signed that day, for she had just lost her father.

When Edward drove her home after the meeting, he repeated his earlier statement that the agreement had to be signed in the best interests of her and the children. Irene stated that she did not receive a copy of the agreement following the meeting. At the meeting, Edward also executed an assignment of beneficial interest in the parties' home in Barrington to Irene.

Over defense counsel's objection concerning attorney/client privilege, Passman testified that he conducted a telephone conversation with Irene prior to the March 17 meeting. Passman told Irene that Hodes had contacted him concerning the agreement which was to provide for certain financial arrangements as well as a moratorium on divorce for two years. Irene was unwilling to drive to Passman's office to discuss the agreement; however, they had a subsequent telephone conversation wherein she stated that she was familiar with the items on the balance sheet and acquainted with what her husband owned. Passman stated that Irene confirmed that an agreement had been reached, and that her primary concerns were to obtain a college education and the support of herself and her children. Passman never sent Irene any letters, drafts of the agreement, or any other documents.

Passman stated that at the March 17 meeting, Seils read through the agreement from its beginning, thereby affording the parties the opportunity to voice their objections. Irene did not voice any objections, nor did she indicate that she did not understand any portion or provisions contained in the agreement. Passman described Irene's demeanor as very quiet and composed, and that she did not appear distressed. Irene left Hodes' office with an executed copy of the agreement. Passman submitted to Edward a bill for legal services rendered in the amount of $680.

According to Seils, Irene had been distraught, upset and crying at the March 7 meeting at Davis' office; however, at the time the agreement was executed on March 17 she did not appear upset. Seils' secretary, who notarized the parties' signatures on the agreement, testified that Irene appeared poised, calm, and attentive to the proceedings.

The executed agreement provided, *inter alia*, that Edward would not bring an action for dissolution for two years; that Irene would re-

ceive maintenance in the amount of $10,000 per month; an expense-paid education at Northwestern University; support and college education of the two children; title to the Barrington residence, which the parties agreed had a value of $1 million; and a new Mercedes-Benz automobile. The agreement also stated that "it is agreed and confirmed that Edward always has been and is now the sole owner of all of the shares of Richardson Electronics," which was characterized as nonmarital property. The following assets and liabilities were set forth in the balance sheet attached to the agreement:

| ASSETS: | |
|---|---|
| Cash | $ 10,000.00 |
| Vested Interest in Profit Sharing Plan | 360,691.00 |
| Net Worth of Richardson Electronics as of 12-31-82 | 10,466,735.00 |
| Net Worth of Richardson Farms (160 acres Land & Buildings) | 636,259.00 |
| Net Worth of Richardson Hunt Club as of 1-31-83 | 60,822.00 |
| 400 acres West Brooklyn, Illinois (Richardson Hunt Club) | 400,000.00 |
| ½ Acre—Addison, Illinois | 40,000.00 |
| House—13 Acres Land in Barrington, Illinois | 1,000,000.00 |
| 50% Interest in Industrial Building (3030 North River Road) | 225,000.00 |
| Cash Surrender Value Misc. Life Insurance Policies | 50,000.00 |
| | $13,249,507.00 |
| TOTAL LIABILITIES | - $ 1,550,900.00 |
| NET WORTH | $11,698,607.00 |

With respect to the assets listed on the balance sheet, Irene received the Barrington house together with its adjacent acreage. All of the remaining assets, together with the liabilities, were given to Edward. Irene points out that, at best, she received 7.55% of the assets ($1,000,000/13,249,507 = 7.55%).

The stock of Richardson Electronics, valued on the balance sheet as having a net worth of $10,466,735, represented a per share value of $3.54 ($10,466,735/2,952,000 shares). In October 1983, eight months after the execution of the agreement, a public offering was

made of the Richardson Electronics stock. Edward sold 200,000 of his 2,952,000 shares of stock for $2,900,000. As such, Edward's interest in his remaining shares of Richardson Electronics was worth approximately $41,000,000.

Paul J. Much, who testified on behalf of Irene at trial, stated that as of March 17, 1983, the fair market value of Richardson Electronics was $37 million. However, the trial court found that Much's analysis was flawed because the expert's selection of comparable companies used as a basis of comparison with Richardson Electronics had no relationship whatsoever to the business engaged in by Richardson Electronics, which she described as an "extremely narrow, specific and limited product in a waning marketplace."

American Appraisal Associates (American Appraisal) was retained by both parties to value the stock in Richardson Electronics and the other assets of the parties. As of March 17, 1983, American Appraisal estimated the value of the Richardson Electronics stock at $24,400,000. The value of the stock as of February 1, 1990, rose to $63,432,758. When Edward declined to call American Appraisal during his case in chief, Irene sought to call this firm to testify as an adverse witness. The trial court refused to allow this testimony, for to do so would have permitted Irene to call two witnesses while Edward produced none. Thus, no contrary expert testimony on the stock valuation was presented on behalf of Edward.

One of the central issues in this case concerns the redemption of the 12 shares of Richardson Electronics stock held by Edward's mother, Florence. In Edward's motion for partial summary judgment, he claimed that prior to the parties' marriage, he received seven shares of stock on May 31, 1962, three additional shares on May 31, 1963, and attached copies of the stock certificates. Edward and his mother both testified in their depositions that the dates on the stock certificates were accurate. Edward claimed to acquire two more shares of stock on May 3, 1964 and June 30, 1965. Edward maintained that, pursuant to section 503(a)(6) of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1989, ch. 40, par. 503), said shares constituted nonmarital property.

However, on March 4, 1990, Edward conceded that the 10 stock certificates representing Florence's stock which he alleged to have received prior to his marriage were not accurate. Thus, it is undisputed that Edward acquired all of his shares of stock in Richardson Electronics after the date of the marriage of the parties. Irene obtained the services of two document authenticity experts on the issue of the date of delivery to Edward, but the trial judge felt that there was no

necessity of having this evidence presented, because the issue of the date of the stock, germane to the issue of such stock being the non-marital property of Edward, was not appropriate at that stage of the proceeding.

Irene and Edward operated under the terms of the agreement without incident from March 17, 1983, through November 23, 1987, at which time Edward filed a petition for dissolution of marriage. On April 21, 1988, Edward filed an amended petition pleading that the parties' March 17, 1983, agreement fully disposed of all property, maintenance, child custody and support issues. Irene contended that the agreement was illegal and unconscionable, and that it had been procured by fraud and duress.

During the pendency of the dissolution proceedings, Irene filed an emergency petition for temporary maintenance and other emergency relief, alleging that the marital residence in which she lived suffered extensive damage due to faulty architectural and structural design and to flooding. At the hearing, Hugh Cahill testified that the south wall of the sunken garage and the intersection of the retaining walls were cracked. More importantly, the house suffered from serious design defects which rendered the house in a condition dangerous to life safety.

After hearing the expert testimony, the trial judge stated that the structural integrity of the Barrington residence was severely compromised and posed an immediate hazard to the health and safety of the occupants. The court also noted that the vast majority of the problems could never be classified as "maintenance" problems; rather, they were structural design problems. The trial judge further recognized that the costs of the repairs increased with the passage of time through delays occasioned by Edward's counsel. Edward was ordered to pay for the costs of the required structural repairs which eventually totaled $400,000; however, after the judge determined that the agreement was valid, Irene was ordered to reimburse Edward for the cost of the repairs.

Irene consistently argued throughout the pretrial proceedings that the agreement was drafted pursuant to section 502 of the Act, which provides in relevant part:

> "The terms of the agreement, except those providing for the support, custody and visitation of children, are binding upon the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties, on their own motion or on request of the court,

that the agreement is unconscionable." Ill. Rev. Stat. 1989, ch. 40, par. 502.

However, the trial court relied upon *Stern v. Stern* (1982), 105 Ill. App. 3d 805, 434 N.E.2d 1164, which states that pursuant to section 503(a)(4) of the Act, parties may agree *inter se* by *valid agreement* to treat certain property as "nonmarital," thereby exempting such property from the marital estate from consideration by a court at a later time when a dissolution proceeding is initiated.

The trial judge found Irene to be an intelligent, sophisticated woman who worked at her husband's company for many years, and who knew the number of employees, the book value, the sales figures, the realty assets as well as the cost of improvements made to the real estate. The judge noted that Irene conducted some of the negotiations personally before obtaining counsel; that she received the advice of two attorneys with regard to the agreement; and that she did not mention to the second attorney the fact that she was advised by her prior counsel not to sign the agreement. The court found no basis in sustaining Irene's claim of coercion and duress, and that there was no credible evidence in that regard. After examining the entire agreement, which provided for maintenance, the children's expenses, Irene's college education, the payment of the mortgage, real estate taxes and insurance on Irene's home, the payment of the income tax liabilities of the parties, the payment of all outstanding liabilities pertaining to Irene's home as well as the company, and the provision for a new automobile, the court did not find the agreement to be unconscionable.

Although Irene challenges a number of the trial court's evidentiary rulings and the propriety of Edward's declaratory judgment action and the entry of a bifurcated judgment, the crux of Irene's argument on appeal concerns the validity of the agreement, which she attacks as procedurally and substantially unconscionable.

■ It is well established that the law favors peaceful settlement of marital dissolution disputes. (*Guyton v. Guyton* (1959), 17 Ill. 2d 439, 444, 161 N.E.2d 832; *In re Marriage of Chapman* (1987), 162 Ill. App. 3d 308, 515 N.E.2d 424; *In re Marriage of Maher* (1981), 95 Ill. App. 3d 1039, 420 N.E.2d 1144.) Whether a divorce decree should be modified rests within the discretion of the trial court, and the trial court's findings will be disturbed on appeal only when the evidence clearly so requires. *In re Marriage of Riedy* (1985), 130 Ill. App. 3d 311, 474 N.E.2d 28.

Irene argues that the agreement should be properly characterized as one made pursuant to section 502 of the Act, which purports to

promote amicable settlement of disputes by allowing the parties to enter into an agreement to dispose of their property attendant upon the dissolution of their marriage. However, as previously set forth, section 502(b) provides that the court may set aside such an agreement if it finds it to be unconscionable. The court determined that the agreement was drawn pursuant to section 503(a)(4) of the Act; nevertheless, that provision states that the parties may categorize property as "nonmarital" only if they have reached a valid agreement. Thus, prior to the determination of whether the agreement was contemplated to comport to section 502 or section 503(a)(4), the threshold question necessarily becomes whether we are dealing with a conscionable, and therefore, valid agreement.

An unconscionable bargain has been defined as one " 'which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other.' " (*In re Marriage of Carlson* (1981), 101 Ill. App. 3d 924, 930, 428 N.E.2d 1005 quoting *Hume v. United States* (1889), 132 U.S. 406, 410, 33 L. Ed. 2d 393, 395, 10 S. Ct. 134, 136.) In determining whether the parties' relative economic positions are unconscionable, courts employ commercial concepts of unconscionability: an absence of a meaningful choice on the part of one of the parties combined with terms unreasonably favorable to the other party. (*In re Marriage of Foster* (1983), 115 Ill. App. 3d 969, 451 N.E.2d 915; *In re Marriage of Carlson*, 101 Ill. App. 3d 924, 428 N.E.2d 1005.) Unconscionable terms are also defined as improvident, totally one-sided and oppressive. *In re Marriage of Brandt* (1986), 140 Ill. App. 3d 1019, 489 N.E.2d 902; *In re Marriage of Foster*, 115 Ill. App. 3d 969, 451 N.E.2d 915.

■ The inquiry into unconscionability requires two distinct considerations: (1) the conditions under which the agreement was made; and (2) the economic circumstances of the parties resulting from the agreement. (*In re Marriage of Foster*, 115 Ill. App. 3d 969, 451 N.E.2d 915.) The determination of unconscionability focuses on the parties' relative economic positions immediately following the making of the agreement. *In re Marriage of Smith* (1987), 164 Ill. App. 3d 1011, 518 N.E.2d 450.

We focus our attention first upon the conditions under which the agreement was made. The record reveals that while the parties separated in 1980, it is apparent that it was Edward, and not Irene, who wanted the divorce to occur. Although Irene did initiate dissolution proceedings in November 1981, the proceedings were dismissed shortly thereafter in February 1982. Edward stated that after discussing the various settlement terms, it was obvious that Irene did not

want a divorce. At the time that Hodes, Edward's corporate counsel, initially spoke with Davis about representing Irene, he also stated that Irene was anxious to get back together with her husband, who was willing to try and get back together again. After Davis' initial meeting with Irene, he remarked that if the parties really wanted to reconcile, they should attend marital counseling.

We also assess the impact that Irene's father's illness had upon her mental state. We first note that the agreement was signed one week after his death on March 11, 1983. Testimony was introduced that from the time Irene learned of her father's illness in September 1982 until his death, she spent a great deal of time at the hospital with him, and that she also made the funeral arrangements. Rapier testified that Irene was emotionally stressed during the winter of 1983 over her father's impending death. Grember stated that Irene hoped that she was not going to lose her father as well as her marriage. Too, both Irene and her mother testified that at her father's wake, Edward told them that they would be a family again soon.

More importantly, we now consider the conditions immediately preceding the execution of the agreement. On March 7, 1983, the parties met with Davis and Edward's attorney, Seils, for a conference. We note initially that Seils had very little expertise in the area of matrimonial law. Seils testified that Irene stated at this meeting that she did not want to get divorced, and she was crying and distraught. Davis recommended that Irene not sign the agreement because it was not a good deal for her. Edward himself stated that when he drove Irene home following the meeting at Davis' office, she was crying and told him that she did not want a divorce. Nevertheless, Edward stated that there was no doubt in his mind that he would ultimately divorce Irene.

Apparently dissatisfied with Davis' advice that Irene refrain from signing the agreement, Edward spoke with Hodes later that same afternoon in an attempt to find another attorney to represent Irene. While we reserve our comments as to the propriety of this strategy, the record shows that Hodes contacted Passman, a former associate at his own law firm, and asked whether he would represent Irene. Similar to Seils, Passman had very little experience in matrimonial law and had never prepared a post-nuptial agreement from its inception. Hodes told Passman that the parties had reached an agreement, that this was a matter that had to be dealt with quickly, and that Edward would pay his fee. Hodes also told Passman that Irene was unrepresented by counsel. However, the record reveals that Irene never explicitly terminated Davis, nor did he ever specifically state that he

would not represent Irene. Indeed, Passman later commented that had he known that Davis previously represented Irene, he would never have undertaken her representation.

While Passman's and Irene's testimony is contradictory concerning whether they actually spoke with each other over the telephone, it is undisputed that they had never met, nor had Passman ever sent Irene any letters, drafts of the agreement, or any other documents prior to the March 17 meeting. Irene testified that she thought the purpose of the meeting was simply to exchange title between properties. Further, she could not comprehend why the agreement had to be signed that day for she had just lost her father. Although Edward, Passman, Seils and his secretary all testified that Irene was not crying or distraught while the agreement was executed, Edward and Seils both testified that at the meeting which occurred just 10 days earlier at Davis' office, Irene was crying and upset and stated that she did not want the divorce.

Duress may be sufficient to render an agreement between spouses unconscionable. (*In re Marriage of Chapman*, 162 Ill. App. 3d 308, 515 N.E.2d 424.) Duress includes oppression, undue influence, or taking undue advantage of the stress of another to the point where another is deprived of the exercise of free will. (*In re Marriage of Chapman*, 162 Ill. App. 3d 308, 515 N.E.2d 424; *In re Marriage of Riedy*, 130 Ill. App. 3d 311, 474 N.E.2d 28; *Stavins v. Stavins* (1979), 70 Ill. App. 3d 622, 388 N.E.3d 928.) Evidence of duress must be clear and convincing before a court may set aside a marital settlement agreement on this basis. *In re Marriage of Riedy*, 130 Ill. App. 3d 311, 474 N.E.2d 28; *In re Marriage of Carlson*, 101 Ill. App. 3d 924, 428 N.E.2d 1005.

■ Upon close review of the circumstances in this case, we find that Irene labored under an extraordinary amount of duress at the time the agreement was executed, sufficient to warrant our setting aside the agreement as unconscionable. It is evident that Edward intended to divorce Irene; nevertheless, he resorted to such tactics as promising her that "they would be a family again" and including the two-year moratorium on divorce in order to influence her decision to enter into the agreement. Seils, too, testified that Edward indicated that the purpose of including the moratorium in the agreement was to give the parties a chance to reconcile.

We also find, under the circumstances, the manner in which Edward attempted to substitute Passman for Irene's previous counsel deplorable. Passman did not consider himself to be a matrimonial attorney, yet he took part in a post-nuptial settlement agreement involv-

ing millions of dollars. Passman spent only 20 minutes reviewing the financial information relative to the balance sheet, made no inquiry as to whether the Richardson Electronics stock was marital or nonmarital, and did not ask for any further documents or financial information to verify any of the entries on the balance sheet. While Passman made some minor changes in the draft agreement in the week preceding its execution, he never sent Irene any letters or copies of the agreement prior to the March 17 meeting.

■ We now turn to the second prong of this analysis, which concerns the economic circumstances of the parties resulting from the agreement. As previously set forth, Irene received maintenance in the amount of $10,000 per month with built-in cost of living adjustments, an expense-paid college education as well as support and college education of the two children, a new Mercedes Benz automobile, and title to the Barrington residence and acreage valued at $1 million. However, as previously discussed, the residence suffered from severe structural design defects and required substantial repairs in the amount of $400,000, for which Irene was required to reimburse Edward. Edward received all remaining assets listed on the balance sheet, which includes, most significantly, the Richardson Electronics stock. At most, Irene received only 7.55% of the assets, with Edward receiving the remainder listed on the balance sheet. Such a bargain cannot be countenanced by this court in good conscience, especially in view of the length of the parties' marriage and Irene's active participation in the business.

In this case, we find that Edward substantially undervalued the Richardson Electronics stock on the balance sheet as worth $10,466,735, as evidenced by the fact that he sold 200,000 shares for $2,900,000 at a public offering approximately eight months after the execution of the agreement. Both parties acknowledge that after this transaction, the remaining stock was worth approximately $41 million. The trial judge found that there was no evidence in the record demonstrating any knowledge that this action was being planned at the time or prior to the execution of the agreement. However, we note that Edward tried to sell the company in 1980 through Salomon Brothers at a price between $12 to $15 million, and rejected the offer from Bell Industries as too low for $9.89 million plus a structured earn-out formula that would pay additional funds. Since that time, Richardson Electronics acquired the assets of National Electronics and later merged with Centron Electronics to improve its market position. We note as well that Irene's expert stated that the fair market value of the company on March 17, 1983, was $37 million. Although

the trial court refused to allow the testimony of American Appraisal, it estimated the stock value of the company at $24,400,000.

■■■ In order to be fraudulent, a misrepresentation must consist of a false statement of material fact, known to be false by the party making it, made for the purpose of inducing the other party to act in reliance on its truth, and in fact relied upon by the other party. (*In re Marriage of Riedy*, 130 Ill. App. 3d 311, 474 N.E.2d 28; *In re Marriage of Maher*, 95 Ill. App. 3d 1039, 420 N.E.2d 1144.) Fraud may consist in the concealment of what is true as well as in the assertion of what is false where the concealment is shown to have been done with the intention to deceive under circumstances creating an opportunity and duty to speak. (*In re Marriage of Gurin* (1991), 212 Ill. App. 3d 806, 571 N.E.2d 857.) Fraud must be established by clear and convincing evidence. (*In re Marriage of Riedy*, 130 Ill. App. 3d 311, 474 N.E.2d 28; *In re Marriage of Maher*, 95 Ill. App. 3d 1039, 420 N.E.2d 1144.) In this case, we find that Irene produced sufficient evidence to demonstrate Edward's misrepresentation of the value of the stock, thereby showing that her reliance thereon was misplaced.

In addition, we find that the trial judge should have allowed Irene to introduce evidence that the stock certificates purportedly given to Edward by his mother prior to his marriage were not authentic. In essence, Edward's attempt to portray the stock as a nonmarital asset can also be characterized as a fraudulent misrepresentation which induced Irene to enter into the agreement and give up her interest in Richardson Electronics to her detriment.

Concealment of existing material fact is actionable where it is employed as a device to mislead (*In re Marriage of Gurin*, 212 Ill. App. 3d 806, 571 N.E.2d 857; *Chapman v. Hosek* (1985), 131 Ill. App. 3d 180, 475 N.E.2d 593), such as where it relates to a matter upon which plaintiff could be expected to rely in determining whether to engage in conduct in question (*Shah v. Chicago Title & Trust Co.* (1983), 119 Ill. App. 3d 658, 457 N.E.2d 147), or such that had the defrauded party been aware of the concealed fact, he would have acted differently. (See *Obermaier v. Obermaier* (1984), 128 Ill. App. 3d 602, 470 N.E.2d 1047.) This court has held that in instances where the trial court finds that respondent shielded certain marital assets from the petitioner, and thus prevented petitioner from making an informed decision to enter into the property settlement, or the trial court from making a fair and equitable distribution of the marital property in just proportion, the court should find the settlement unconscionable. *In re Marriage of Burch* (1990), 205 Ill. App. 3d 1082, 563 N.E.2d 1049.

Accordingly, we find that the March 17, 1983, agreement entered into between the parties fails as being both procedurally and substantially unconscionable. The record before us indicates that the property terms of the agreement were not fair and reasonable, and that Edward received a disproportionate share of the assets.

For the foregoing reasons, we affirm the trial court's order of dissolution between the parties and reverse that portion of the judgment finding the agreement valid. We remand this cause to the trial court for the purpose of conducting a full evidentiary hearing pursuant to sections 502 and 510 of the Act (Ill. Rev. Stat. 1989, ch. 40, pars. 502, 510) on the issue of property distribution. In light of our ruling, which will affect the marital assets including the Barrington residence awarded to Irene, we also vacate the judgment against Irene in the amount of $400,000 for reimbursement of the home repairs.

Affirmed in part; reversed in part and remanded.

RAKOWSKI and BUCKLEY,* JJ., concur.

---

*Justice Rosemary La Porta participated in oral argument prior to her death. Justice Robert Chapman Buckley was substituted on the panel and has listened to the oral argument tape and has read the briefs.