2024 IL App (1st) 231794-U

FIFTH DIVISION
September 13, 2024

No. 1-23-1794

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | Appeal from the |
| KRASSIMIR DIMITROV, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellant, | ) | |
| | ) | No. 22D9862 |
| and | ) | |
| | ) | Honorable |
| TSVETA DIMITROVA, | ) | Scott Tzinberg, |
| | ) | Judge Presiding. |
| Respondent-Appellee. | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Mitchell and Lyle concurred in the judgment.

**O R D E R**

¶ 1    *Held*:    The circuit court's finding that the parties' postnuptial agreement was substantively unconscionable is affirmed, where the agreement awarded 100% of listed assets and comparably few liabilities to the petitioner.

¶ 2    As part of the parties' dissolution of marriage proceedings, Krassimir Dimitrov (Krassimir) moved for a declaratory judgment, seeking a declaration that a postnuptial agreement (the agreement) between himself and his wife, Tsveta Dimitrova (Tsveta), was valid and enforceable. The circuit court denied the motion and found the agreement substantively unconscionable.

Krassimir appealed from that order under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Krassimir and Tsveta were married on August 7, 2018. They had one child. Before the dissolution action was filed, the parties signed the agreement.

¶ 5     The agreement included a clause stating that both parties had the opportunity to seek independent legal counsel before signing. It specified that attorney "Donika Nikolov" advised Tsveta. It also included a provision by which the parties indicated that the agreement was conscionable, executed voluntarily, and with knowledge of the other's property and financial obligations.

¶ 6     The agreement specified the parties' rights, assets, and liabilities as follows:

- Both parties waived the following: (1) claims for spousal support, maintenance, reimbursement, and dissipation; (2) any rights in the other's separate, premarital, or postdissolution-acquired property; and (3) any claim of nondisclosure as a basis for invalidating the agreement.

- Both parties received the following: (1) 50% of what was narrowly defined in the agreement as "joint property" to include property held in coownership and furniture, furnishings, and any appreciation of that specified property; and (2) 50% of the other's retirement assets—which were not listed or valued.

- Each party received separately his or her own jewelry, effects, and personal property titled in his or her own name.

- In the event of dissolution proceedings, each party assumed responsibility for its own attorney fees. If, however, either party challenged the validity of the agreement, that

party would assume responsibility for both parties' fees.

- Krassimir received the following which were defined in the agreement as "separate property": (1) a U.S. Bank Business Account with an approximate balance of $7400, (2) three investment accounts with an aggregate balance of $11,699, (3) a 2021 BMW X3 M40i valued at $60,000, (4) a 2019 VW Tiguan valued at $27,000, (5) a business titled "Tiger Expedite, Inc." with no listed value, (6) liability for two specific credit cards, with an aggregate balance of $13,127, and (7) two parcels of real estate with a combined fair market value of $460,000 and aggregate mortgages amounting to $332,319.

- The agreement stated that "[n]othing contained [therein] shall adversely affect what would otherwise be the obligation of either party to support their children[.]"

¶ 7     Tsveta signed the agreement on March 16, 2022. Krassimir signed it on March 21, 2022.

¶ 8     In December 2022, Krassimir petitioned for dissolution of the marriage. In January 2023, he moved for a declaratory judgement asking the circuit court to declare the agreement valid and enforceable. In her response to Krassimir's motion, Tsveta argued that the agreement was invalid because it lacked consideration and was procedurally and substantively unconscionable.

¶ 9     On July 14, 2023, the circuit court held an evidentiary hearing on Krassimir's motion. Both parties were present and represented by counsel. No court reporter was present.

¶ 10    The circuit court's written order stated that the court received testimony, reviewed exhibits, and heard arguments. We recount the following facts as described in the court's detailed four-page written account of the hearing and ruling on the motion.

¶ 11    Tsveta testified to receiving the agreement in March 2022. She did not know what it was. She went to see a Bulgarian-speaking attorney, Donika Nikolov, who translated and explained the agreement to Tsveta. Ms. Nikolov advised Tsveta not to sign.

¶ 12    Tsveta did not initially sign. She testified that Krassimir then threatened to not purchase airline tickets for her to travel to Bulgaria, where her family lived and where she regularly visited. She stated that Krassimir then threatened that she would not see her family again, and that her lack of knowledge of "how things work in America, her inability to speak English, [and his comparable] knowledge of how things work" would result in him obtaining custody of their child.

¶ 13    Tsveta returned to see Ms. Nikolov the next day and signed the agreement. Krassimir bought tickets to Bulgaria "on or about March 21, 2022," the day Tsveta signed.

¶ 14    According to the circuit court order, in his testimony, Krassimir denied saying "anything that resembles what [Tsveta] alleg[ed] was said/threatened." Krassimir testified that he tried to "save the marriage" and that he always intended to purchase the tickets to Bulgaria. According to Krassimir's testimony, the timing of Tsveta's signing and the purchase of the tickets was a coincidence.

¶ 15    Krassimir testified, and the court noted that Tsveta confirmed, that Tsveta had access to one of the two listed credit cards and had funds that she had received from a civil lawsuit.

¶ 16    The court found the agreement was supported by adequate consideration and was not procedurally unconscionable. While it found Tsveta's account of the events surrounding the agreement's execution more credible than Krassimir's, Tsveta "did have an attorney and the Agreement was explained to her." Her counsel advised her not to sign, and she executed the agreement "a day after the alleged threats were made."

¶ 17    The court ruled, however, that the agreement was substantively unconscionable. The circuit court reasoned "[the agreement] awarded 100% of all property that existed at the time of signing" to Krassimir. The court also explained, "[w]hile [Krassimir] did assume [the debt from] two credit cards ([a] total of approximately $13,000.00), his testimony was that there was now approximately

$50,000.00 [of debt] and that he was seeking contribution to this debt from [Tsveta]."

¶ 18    The court's order noted that "[d]uring the hearing, it was represented that the two vehicles [listed in the agreement] were leased and therefore did not have the value as indicated." The court lastly stated that the parties had acknowledged that there were "additional property and debts" not listed in the agreement.

¶ 19                                    II. JURISDICTION

¶ 20    This is an appeal from the circuit court's August 8, 2023, order denying Krassimir's motion for a declaratory judgment. On September 28, 2023, the circuit court issued an order pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), in which it found no "just reasons for delaying appeal" from that order. Krassimir timely filed a notice of appeal on October 4, 2023.

¶ 21    We have jurisdiction under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), governing appeals from final judgments as to one or more but fewer than all of the parties or claims where the circuit court issues an "express written finding that there is no just reason for delay[.]" See *In re Marriage Best*, 228 Ill. 2d 107, 113 (2008) (holding a ruling on a motion for declaratory relief entered during the course of dissolution proceedings is appealable under Rule 304(a)); accord *In re Marriage of Heinrich*, 2014 IL App (2d) 121333, ¶¶ 27-33.

¶ 22                                    III. ANALYSIS

¶ 23    A. The Absence of a Transcript or Bystander's Report Does Not Bar This Appeal

¶ 24    On appeal, Tsveta cites *Foutch v. O'Bryant*, 99 Ill. 2d 389 (1984), and argues that the lack of a transcript or bystander's report requires us to affirm without reaching the merits.

¶ 25    Krassimir clearly tried to obtain a bystander's report and in fact filed a motion asking this court to order the circuit court to certify a bystander's report, which we denied. We did allow several extensions of the deadline to file the opening appellant brief, however, to allow Krassimir

to seek a certified report from the circuit court, which it appears he was not able to obtain.

¶ 26    We reject Tsveta's argument that Krassimir's inability to obtain a bystander's report renders us unable to consider the merits of this appeal. Our review of the agreement for substantive unconscionability is *de novo* and based on the contract's terms themselves. *In re Marriage of Tabassum & Younis*, 377 Ill. App. 3d 761, 777 (2007). We therefore have no need to review additional evidence or be informed of the circuit court's reasoning.

¶ 27    There are two factual issues, however, that may be relevant. As we discuss below, the first is the circuit court's account of Krassimir's testimony about the credit cards. The absence of a transcript or bystander's report deprives Krassimir of a way to contest the circuit court's account of that testimony. But Krassimir never disputes that he testified that he would seek contribution from Tsveta for the additional credit card debt. Thus, we clearly have a sufficient record by which to consider this fact.

¶ 28    The second is the amount of an award that Tsveta received from a civil lawsuit and her salary earned from employment obtained after signing the agreement. Krassimir argues the agreement was conscionable partly because it allowed Tsveta to keep those assets—although he argues she owes him a portion of her earnings for expenses related to raising their child.

¶ 29    The circuit court's decision indicates that both parties are currently employed and both parties testified that Tsveta received funds from a civil lawsuit. The court's order, however, does not describe the amount that Tsveta received from the settlement or her current salary. Concerning these facts alone then, Tsveta is right to point out that, as the appellant, it was Krassimir's burden to present a sufficiently complete record to support his claim. *Chicago Title & Trust Co., Trustee Under Trust No. 89-044884 v. Chicago Title & Trust Co., Trustee Under Trust No. 1092636*, 248 Ill. App. 3d 1065, 1075 (1993) (citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)). Thus,

"any doubts which may arise from the incompleteness of the record [are] resolved against [him]." *Id.* Without proof that Tsveta was in possession of what Krassimir averred was a $10,000 award and a $20-per-hour salary, we cannot, and we do not, consider either of those facts.

¶ 30                                    B. The Agreement was Unconscionable

¶ 31    The Illinois Marriage and Dissolution of Marriage Act requires the circuit court to identify the parties' marital and nonmarital property in a dissolution of marriage proceeding. 750 ILCS 5/503 (West 2022). Marital property is defined to include "all property including debts and other obligations, acquired by either spouse subsequent to marriage" with specified exceptions that are not applicable to the issues here. *Id.* § 503(a).  The parties are permitted to exclude property from the marital estate by a "valid agreement of the parties[.]" *Id.* § 503(a)(4).

¶ 32    A determination of whether a contract, such as this agreement that certain property is nonmarital, "is unconscionable is a question of law that we review *de novo*." *In re Marriage of Prill*, 2021 IL App (1st) 200516, ¶ 15. A finding of unconscionability can be based on procedural grounds, substantive grounds, "or a combination of both." *In re Marriage of Arjmand*, 2013 IL App (2d) 120639, ¶ 30. "Substantive unconscionability is based on the fairness and obligations of the contract's terms, and it can be shown by contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." (Internal quotation marks omitted.) *In re Marriage of Tabassum & Younis*, 377 Ill. App. 3d at 777. "[N]ot every unfair agreement is substantively unconscionable." (Internal quotation marks omitted.) *In re Marriage of Prill*, 2021 IL App (1st) 200516, ¶ 25. "To rise to the level of being unconscionable, the settlement must be improvident, totally one-sided or oppressive." *In re Marriage of Gorman*, 284 Ill. App. 3d 171, 182 (1996).

¶ 33    Krassimir argues the agreement was not unconscionable because, while it awarded

substantial listed assets to him, it also assigned all liabilities to him. These include two mortgages and credit card debt. It would not, according to his accounting, be totally one-sided for Tsveta to "walk[ ] away" from what he describes as a "net-negative" estate.

¶ 34    Krassimir's description of the distribution of assets and liabilities regarding the real estate is, however, inaccurate. Subtracting the outstanding mortgages from the aggregate market values of the properties yields a net-positive amount. ($460,000-$332,319=$127,681). Subtracting the remaining liabilities—$13,127 in credit card debt—from that equity yields a total of $114,554 awarded to Krassimir. ($127,681-$13,127=$114,554).

¶ 35    Those were not the only assets the agreement defined as "separate" and then allocated. As the circuit court did, we ignore the value of the automobiles, since there was testimony that they were leased. Krassimir was, however, awarded a U.S. Bank Business Account ($7400) and three investment accounts ($11,699). In addition, the agreement provided that both parties waived any right to maintenance, despite Krassimir's business taking in an approximate $135,000 per year of revenue and providing him with an annual salary of approximately $30,000, while the agreement stated Tsveta was, at the time of signing, unemployed.

¶ 36    The situation is similar to *In re Marriage of Callahan*, 2013 IL App (1st) 113751. There, the divorcing parties signed a marital settlement agreement that allocated to the petitioner "all marital debt, which amounted to approximately $100,000." *Id.* ¶ 4. It also awarded the petitioner certain marital assets, including his pension plan allegedly valued at $1,500,000. *Id.* ¶ 22. We held that the terms of the parties' agreement were unconscionable because the debts did "not come close to offsetting the value of what [the petitioner] received." *Id.* ¶ 23. The same is true in this case, although clearly the parties here had far fewer assets than did the parties in *Callahan*.

¶ 37    *In re Marriage of Richardson*, 237 Ill. App. 3d 1067 (1992) is also instructive. There, we

8

found a postnuptial agreement substantively unconscionable because it awarded only 7.55% of the marital assets to one party. *Id.* at 1083. Tsveta, similarly, according to the terms of the agreement, received only 50% of certain defined marital property, including "furniture." The value of these items is not listed, and so we have no basis to conclude that they fairly offset the agreement that otherwise allocated 0% of listed assets to Tsveta.

¶ 38 Krassimir attempts to distinguish both *Callahan* and *Richardson* by arguing the amount awarded to him here is net-negative and much less than what was awarded to one of the parties in those cases. As we have already determined, however, Krassimir's account of what was awarded to him under the agreement is inaccurate. Also, the holdings in *Callahan* and *Richardson* did not turn on the size of the respective estates, but on the oppressive and one-sided character of the underlying marital contracts allocating those estates. *In re Marriage of Richardson*, 237 Ill. App. 3d at 1083; *In re Marriage of Callahan*, 2013 IL App (1st) 113751, ¶ 23.

¶ 39 While we agree with Krassimir that an unfair distribution is not inherently unconscionable, an agreement is unconscionable if it is "improvident, totally one-sided," (internal quotation marks omitted.) (*In re Marriage of Callahan*, 2013 IL App (1st 113751, ¶ 23) or so unfair that "no man in his senses *** would make [it]" (internal quotation marks omitted.) (*In re Marriage of Richardson*, 237 Ill. App. 3d at 1080). That is the situation here. The court "cannot [therefore] enforce [the agreement] consistent with the interests of justice." (Internal quotation marks omitted.) *In re Marriage of Prill*, 2021 ILL App (1st) 200516, ¶ 25.

¶ 40 Krassimir also argues the circuit court erred in considering his testimony that he would seek contribution from Tsveta for the increase in credit card debt. Krassimir contends the agreement controlled on this point and, "in no uncertain terms," allocated the entire credit card debt to him. We disagree.

9

¶ 41    If the language of the contract is susceptible to more than one meaning, "then an ambiguity is present, and parol evidence may be admitted to aid the trier of fact in resolving the ambiguity." *River's Edge Homeowners' Ass'n v. City of Naperville*, 353 Ill. App. 3d 874, 878, (2004). Section 3.7 of the agreement stated, "The parties shall be respectively responsible for any debts listed in their respective Exhibits A and B." Exhibit B, in turn, listed as the "separate liabilities" of Krassimir, two credit cards: "CitiCards CBNA (7513)" and "Costco Citicards (4604)." The balance of each card was also listed as $10,066.00 on "CitiCards CBNA" and $3,061.00 on "Costco Citicards" for a total of $13,127 in credit card debt. The exhibit said nothing about additional debts incurred on the same credit cards after the agreement's execution.

¶ 42    Section 3.8, defined "Joint Liabilities" to include "all liabilities incurred in the joint names of the parties ***, including but not limited to jointly held credit cards, and which are agreed to in writing by the parties at the inception of the debt." Arguably, this section gave Krassimir a basis to seek contribution from Tsveta for additional credit card debt, and section 3.7 applied only to the amounts listed in Exhibit B. The agreement was therefore ambiguous as to the later-acquired credit card debt. Because of the ambiguity, the circuit court was right to interpret the contract in light of Krassimir's testimony that he would seek contribution from Tsveta for the $50,000 in current credit card debt.

¶ 43    Lastly, Krassimir argues the circuit court erred in noting the existence of property not listed in the agreement. He cites *In re Marriage of Tabassum & Younis*, 377 Ill. App. 3d at 777 for the proposition that Illinois law does not clearly require financial disclosures in postnuptial agreements. He further cites the terms of the agreement itself, whereby both parties waived nondisclosure as a basis for claiming the agreement invalid.

¶ 44    It is unclear from the circuit court's order whether it relied on undisclosed property in

10

finding the agreement unconscionable. Even if it had, our review is *de novo* and we hold the agreement substantively unconscionable based on its own terms, not the existence of other undisclosed property.

¶ 45                                IV. CONCLUSION

¶ 46    For the foregoing reasons, we affirm the circuit court's order finding the postnuptial agreement between the parties substantively unconscionable.

¶ 47    Affirmed.