No. 2--06--0843

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re MARRIAGE OF | ) | Appeal from the Circuit Court |
| OZMA TABASSUM, | ) | of Du Page County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 04--D--2645 |
| | ) | |
| JAVED YOUNIS, | ) | Honorable |
| | ) | Rodney W. Equi, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

The marriage of petitioner, Ozma Tabassum, and respondent, Javed Younis, was dissolved on July 27, 2006. On appeal, petitioner argues that the trial court erred by: (1) declaring invalid a postmarital agreement that designated the marital home as petitioner's nonmarital property in the event of a divorce; (2) limiting its specific finding of dissipation to $5,000; and (3) partially denying petitioner's request for attorney fees. We affirm in part, reverse in part, and remand.

## I. BACKGROUND

The parties were married in Quebec, Canada, on August 27, 2000. Their daughter, Azra, was born on December 15, 2002. The couple purchased a home in Addison, Illinois, on January 30, 2004. In April 2004, petitioner learned that respondent was having an extramarital affair with a coworker. On May 26, 2004, petitioner went to Canada with Azra to visit petitioner's parents, and they returned on June 13, 2004, about one week later than originally planned. While petitioner was

in Canada, she and respondent negotiated the terms of the postmarital agreement, and they signed the agreement on June 15, 2004.

The postmarital agreement provides in relevant part:

"WHEREAS, the Husband has committed acts of infidelity in violation of the bonds of matrimony; and

WHEREAS, because of the Husband's conduct, the Wife has considered filing and prosecuting a Petition for Dissolution of Marriage[;] and

WHEREAS, the Husband does not want a dissolution of marriage and wants to take steps to reconcile with the Wife and attempt to preserve the marriage; and

WHEREAS, the Wife likewise would prefer to reconcile and preserve the marriage, but due to the conduct of the Husband together with the Wife's dependence on the Husband while married to the husband, the Wife is reluctant to commit to the reconciliation process unless she feels confident about the Husband's commitment, and unless she receives assurances from the Husband that in the event of an eventual dissolution of the parties' marriage, she will be receiving the Addison Property in addition to whatever else she would be entitled to receive upon entry of a dissolution in the absence of this Post-[M]arital Agreement; and

WHEREAS, based on the circumstances, the Husband agrees that the Wife should receive the Addison Property in addition to whatever else she would be entitled to receive upon entry of a dissolution of marriage or judgment for legal separation in the absence of this Post-Marital Agreement; and

WHEREAS, the parties agree that the Addison Property shall at this time remain in

the parties' joint names, but agree that in the event of an eventual legal separation, dissolution of marriage or divorce, the Wife shall receive the Addison Property as her sole and exclusive property. The parties further agree that the distribution of the Addison Property is to be in addition to whatever the Wife would otherwise receive as a result of any such legal separation, dissolution of marriage or divorce. Therefore, such distribution shall not be considered a distribution of marital property to the Wife and shall not be credited as such; and shall not be considered in determining the Wife's assets, income or expenses for purposes of determining the percentage or portion of the marital estate that either party is to receive ***."

Later, the postmarital agreement specifies that if either party files for a legal separation or dissolution, the house "shall be considered the non-marital property of the Wife *** and upon entry of a Judgment, *** the Addison Property shall be awarded to the Wife as her sole, nonmarital property." The postmarital agreement recites that each party was represented by counsel; believed that the terms of the agreement were fair and reasonable; was sufficiently aware of the other's assets and liabilities; and expressly waived any right to further disclosure of assets and liabilities. It also states that the house had a fair market value of $450,000 and an outstanding mortgage of about $350,000. The agreement further contains several pages regarding mortgage payments, liens, and related issues.

Petitioner filed for a dissolution of marriage on November 23, 2004. A trial took place on May 4 and 5, 2006, at which respondent testified as follows. He earned his bachelor's degree in 1991 and had been working since that time for Trans American Medical Company (TAMSCO), a medical instrument company owned by his mother. He was involved in sales and general management. Respondent's W-2 forms reflected that he earned the following amounts from TAMSCO: $40,032

in 2000; $40,350.60 in 2001; $43,333.20 in 2002; $49,833.18 in 2003; $45,499.88 in 2004; and $51,999.84 in 2005. These amounts represented his entire income for each year, other than a cash bonus that he usually received during the first or second quarter of the following year. The amount of the bonus was determined through discussions between respondent and his parents. His bonuses averaged a few thousand dollars, and he did not remember any bonuses larger than $8,000 or $9,000. TAMSCO also paid all of the expenses of respondent's Jaguar.

Respondent himself owned a company called American Pioneer Instruments, Inc. (American Pioneer). The parties stipulated that it was incorporated on May 11, 2000, and involuntarily dissolved on October 1, 2005, for failure to pay franchise taxes. Respondent testified that he had never filed tax returns for the company. American Pioneer still had a bank account with about $200 in it. The latest bank statement he had was from April 29, 2005. Respondent later produced a statement from April 26, 2006. It showed that the account had an ending balance of $269.09 and that a check for $6,000 had been written on April 18, 2006, to New Hampshire Forge, Inc. (NHF). Respondent testified that he issued the check, pursuant to an invoice, to pay for supplies that NHF had sent. Respondent admitted that the invoice indicated that it was for TAMSCO, but he testified that this was a mistake and that it should have stated American Pioneer. TAMSCO did not buy American-made products, while American Pioneer did.

The parties stipulated that respondent's personal bank account showed wire transfer deposits of $17,470 on March 25, 2003, and $17,703 on March 7, 2004. Respondent testified that they came from a company in Mexico. The payments were either for TAMSCO or one of its suppliers in Pakistan, but the money went through respondent's personal account because the client wanted to avoid paying additional Mexican customs taxes.

Respondent admitted that he and petitioner had made changes to the postmarital agreement before it was finalized and that an attorney represented him in connection with the document. At that time, he was not aware of petitioner's assets, but he did not subsequently learn anything new. When respondent first agreed to sign the postmarital agreement, petitioner was in Canada with Azra. Respondent was feeling afraid, panicky, depressed, vulnerable, and uncertain. He feared that he and petitioner would get into an international custody battle and that it would be months or years before he saw Azra again. Petitioner said that she did not want to come back to the United States unless he signed the contract. Respondent admitted that during his deposition, he testified:

"[The] last conversation when I refused to sign the post-nup, she said to me, okay, I am going to file for divorce. I am going to get a quick dissolution of the marriage. And from that, I assumed that she would still have the baby in Canada. She didn't come out and say, you know, I am going to keep the baby up here. But she had it. She had the baby with her. She was late coming back to the United States. And I, you know, -- I think that anyone would have assumed that she was going to keep the baby up there. And it would have taken me months legally to bring the baby back to America."

At trial, respondent testified that basically petitioner overstayed her trip in Canada and was refusing to come back to the United States unless he signed the postmarital agreement. Respondent did not think that the agreement was fair. At the time that he signed it, he was still concerned that petitioner would "take off" with Azra, and he was feeling very vulnerable. Petitioner got a job three or four months after she signed the document, and she filed for divorce one or two months after that. Respondent was surprised by the divorce filing because petitioner had promised to stay with him.

On November 1, 2004, respondent wrote a $5,000 check from the parties' joint account to

Mehmood Drea. Respondent wanted to give Mehmood the check because respondent had "hurt him" by having a relationship with Mehmood's wife, Meyada Drea. The person who was supposed to deliver the check to Mehmood's house instead gave it to Meyada. Meyada either deposited the check into her account or cashed it. Respondent did not consult with petitioner before writing the check. After petitioner returned from Canada, Meyada called the house only two times. Meyada also sent only one e-mail, which respondent printed out with the intent of discussing it with petitioner. Respondent attended marital and sex counseling with petitioner, and it was petitioner's decision to end the counseling.

Respondent testified that petitioner was working prior to Azra's birth but was laid off during her maternity leave. She started working again around September or October 2004. Also around October 2004, petitioner asked him to leave the house. However, respondent did not leave until petitioner filed for divorce in November 2004.

Petitioner provided the following testimony. In April 2004, she came across e-mails that respondent was reading and learned that he was having an affair with Meyada, his secretary at TAMSCO. The next day, petitioner set up marriage counseling.

Petitioner went to Canada with Azra on May 26, 2004. Petitioner's parents had been in the United States for five or six weeks, and petitioner went back to Canada with them because she still needed help with Azra and was feeling depressed, vulnerable, and anxious about respondent's affair. Respondent knew of the trip and provided her with a letter allowing her to take Azra out of the country. In order to attend a niece's birthday party, petitioner stayed about one week longer than the two weeks she had originally planned. Petitioner told respondent of her new plan, and he "was fine with it." She returned on June 13, 2004.

Petitioner was the one who suggested the postmarital agreement. Petitioner wanted the agreement for financial security and to ensure that respondent was taking their marriage seriously. They discussed and negotiated the contract while petitioner was in Canada, and they were both represented by counsel. Petitioner admitted that on May 27, 2004, she wrote an e-mail to respondent that stated, "This contract is from you to me. The problem I had is you. I cannot trust you since you let me down. This contract is going to stay with me if we divorce." The parties came to an agreement by the time that petitioner came back, and they signed the contract on June 15, 2004. At that time, petitioner intended to stay permanently married to respondent.

Immediately after they signed the postmarital agreement, the marriage was "fine." Petitioner and respondent took steps to make the marriage work, such as going to marital counseling. They went out to eat at their favorite places, went for bike rides, and attended barbecues and picnics as a family. Petitioner tried to "do all the same things [she] used to do before [the postmarital agreement] was signed," such as make respondent a cup of tea at night and call him at work to ask how his day was going. Petitioner read a relationship book and talked about it a little with respondent. The parties also "tried to attend religious conventions as much as possible." Petitioner usually initiated the activities, and respondent went along with them. In July 2004, petitioner learned that respondent had been looking at Internet pornography since he was about 18 years old. Petitioner still tried to work on the marriage. They went to sex counseling and took a trip during the first week of August.

After they signed the postmarital agreement, petitioner at first thought that respondent was not in touch with Meyada. Sometime in August, petitioner found out that Meyada was still e-mailing and calling him. Petitioner told respondent that he should cease contact with her, as suggested during the marital counseling, but respondent "admitted [Meyada] would keep calling and he would keep

taking the calls." Petitioner would sometimes see Meyada's number on respondent's cell phone or see printed e-mails from her on the kitchen table. Petitioner would also sometimes be up with Azra early in the morning and see e-mails from Meyada's sister's account. The content revealed that they were really from Meyada.

In August or September 2004, respondent turned "abusive" and no longer cooperated in working on the marriage. Contrary to the marriage counselor's advice, respondent would not discuss the details of his business trips or who he was with or what he was doing. From September to November, respondent made nasty comments to petitioner and ignored and neglected her on the weekends. When she suggested something, he would "shoot it down" and say that she was not welcome to go anywhere with him. Respondent would call her and yell, saying that she was a lousy mother. On other occasions, he would call her evil and say that she was a liar and could "go fry in hell." Respondent's actions caused petitioner severe anxiety. Although she was still doing small, nice things for respondent, he was not cooperating. Petitioner asked respondent if he was still seeing Meyada, and he would reply, "what difference does it make" and "you have your little postnup now." Petitioner learned of the $5,000 check to Mehmood after the parties' checks started bouncing and she called the bank. Petitioner ended their marital counseling when she filed the petition for dissolution.

Regarding her work history, petitioner testified that she had a bachelor's degree in accounting and had worked for about five years in Canada before getting married. She then worked for Mitsubishi until December 13, 2002, a few days before Azra was born. Petitioner was laid off during her maternity leave, and the parties made a joint decision for petitioner to stay at home for a while with Azra. Petitioner was in touch with several head hunters in fall 2003. She did not recall if she had interviewed for any positions from March through May 2004. Petitioner began working for R.R.

Donnelly on September 21, 2004, as a senior financial analyst. Her yearly salary was $67,000.

Petitioner was aware that respondent was receiving cash bonuses, because he would bring the money to her, and she would count the cash and keep it to pay household expenses. From 2001 to 2003, he received about $10,000 per year. In 2004, he received about $15,000. Petitioner admitted that the money was not declared on their joint income tax returns. The parties stipulated that they filed joint federal and state tax returns in 2001 and 2002, that petitioner filed separate returns in 2004 and 2005, and that respondent did not file any returns in 2004 and 2005.

Petitioner had been making mortgage payments of $2,319 per month on the house since April 2005. Before that, the money was coming from the parties' joint account. Petitioner contributed about $20,000 to the down payment on the house, and the remainder came from respondent. The parties stipulated that they purchased their house for $434,000, plus $20,000 for extras. They further stipulated that as of the trial date, the house was worth $565,000 and was encumbered by a mortgage with a balance of $335,236.53.

The parties submitted written closing arguments, and on June 17, 2006, the trial court issued a letter ruling. As its findings are central to the issues contested on appeal, we summarize them in some detail. Regarding respondent's believability, the trial court stated that respondent's "lack of credibility taints and colors his testimony of finances." The trial court found that respondent had filled out his affidavit of expenses "as if it were meaningless," received cash bonuses that he never reported as income, lacked credibility in his testimony regarding the " 'Mexican transaction,' " and had given "contrived" testimony concerning his monthly medical bills. According to the trial court, respondent's "lack of candor and respect for the value of the oath preceding his testimony was obvious and frequent. Given his lack of candor during the discovery process, one can at least say his conduct was

consistent." The trial court found that respondent's annual income exceeded the "$58,000" that respondent claimed and was at least $85,000.

As for petitioner's credibility, the trial court stated:

"This is not to say [petitioner] was a paragon of veracity. As an accountant, her participation in failing to include cash bonuses in taxable income is particularly offensive. Likewise, the court rejects and discounts her testimony as to the circumstances surrounding the execution of the post nuptial agreement."

On the issue of the postmarital agreement, the trial court found, considering the parties' testimony and credibility, that the agreement was invalid because it lacked consideration and was otherwise unconscionable. The trial court stated:

"The only 'consideration' for this alleged agreement was [petitioner's] promise to remain married. A mutual release of property rights provides sufficient consideration (Brosseau v. Brosseau (1998), 176 Ill. App. 3d 450) but here [petitioner] gave up no property rights. While the promise to marry may supply consideration in a pre-nuptial agreement, this 'agreement to remain married' is nothing more than past consideration. Furthermore, the court finds the agreement unconscionable, procedurally and substantively. The 'agreement' was reached (in fact, [respondent] agreed to [petitioner's] terms) while [petitioner] was in Canada with Azra, the implicit threat being that unless agreement was reached she and Azra would remain in Canada, reducing if not eliminating [respondent's] ability to meaningfully parent. After [respondent] agreed to [petitioner's] terms[,] she returned from Canada 2 days later, in essence proceeding directly to her lawyer's office for the execution of the written agreement. After the execution of the agreement [petitioner] begins to look for work, finds

a well-paying job, and shortly after files for divorce, seeking to enforce the agreement. All of this occur [sic] within the context of the fiduciary relationship between husband and wife, and such a context requires that the agreement be scrutinized carefully[.] Bratton v. Bratton (2004), 136 S.W. 3rd 95. The court therefore also finds the agreement is procedurally unconscionable. If two bases to find the agreement unenforceable are not enough, the court finds the agreement to be completely lacking in financial disclosures and substantively unconscionable for that reason."

After designating specific assets and liabilities to the parties, the trial court stated that it was awarding petitioner $30,000 in ascertainable assets and awarding respondent less than $20,000. It also awarded petitioner 60% of the value of the marital residence and respondent 40% of the value. The trial court stated that it was awarding petitioner a disproportionate share of the marital residence because of the uncertainty of respondent's true income; the fact that his income was higher than petitioner's; the inability to determine respondent's dissipation, which "clearly" exceeded $5,000; and the inability to properly value American Pioneer and respondent's nonmarital estate. The trial court noted that if the house yielded the stipulated equity (fair market value minus the remaining mortgage), it would result in petitioner receiving about $137,858 and respondent receiving about $91,905. The trial court added that even if petitioner thought that this distribution was overly generous to respondent, there were additional equities to support the division, in that the evidence showed that respondent was responsible for the bulk of the down payment for and improvement to the residence.

The trial court did not award either party maintenance, finding that they were capable of supporting themselves. Finally, the trial court awarded petitioner $3,419 in attorney fees as a

discovery sanction against respondent. The trial court incorporated its rulings into a judgment for dissolution of marriage, which it entered on July 27, 2006. Petitioner timely appealed.

ANALYSIS

A. Postmarital Agreement

Petitioner first argues that the trial court erred in ruling that the postmarital agreement was invalid based on a lack of consideration. Petitioner argues that her promise to reconcile and forgo filing a dissolution petition was valid consideration for obtaining the house in the event of a dissolution. Whether a contract contains consideration is a question of law (Russell v. Jim Russell Supply, Inc., 200 Ill. App. 3d 855, 861 (1990)), which we review de novo (Department of Transportation v. Lowderman, LLC, 367 Ill. App. 3d 502, 504 (2006)).[1]

The basic requirements of a contract are an offer, an acceptance, and consideration. Melena v. Anheuser-Busch, Inc., 219 Ill. 2d 135, 151 (2006). Consideration is defined as a bargained-for exchange of promises or performance. Tower Investors, LLC v. 111 East Chestnut Consultants, Inc., 371 Ill. App. 3d 1019, 1027 (2007). An act or promise that benefits one party or is a detriment to the other party is consideration sufficient to support a contract. Village of South Elgin v. Waste Management of Illinois, Inc., 348 Ill. App. 3d 929, 940 (2004). Relying on In re Estate of Brosseau, 176 Ill. App. 3d 450 (1988), respondent argues that the postmarital agreement lacked consideration because it did not contain a mutual release of property rights. However, we agree with petitioner that although the Brosseau court held that a mutual release of property rights is sufficient consideration to support a postmarital agreement (Brosseau, 176 Ill. App. 3d at 453), it did not hold that a mutual

_____

[1]As we later discuss, the manifest weight of the evidence standard also comes into play in ultimately resolving the issue of whether the contract was enforceable.

release of property rights is the only type of consideration on which a postmarital agreement may be based.

Our supreme court held long ago that a wife's agreement to end her separation from her husband and dismiss her petition for divorce was consideration for her husband's promise to pay her a certain sum of money if he became drunk or mistreated or abused her again. Phillips v. Meyers, 82 Ill. 67, 70 (1876); cf. Wiegand v. Wiegand, 410 Ill. 533, 542-43 (1951) (wife's agreement to end a separation and return and live with her husband was not consideration for her husband's promise to pay her for doing so, because by returning to and living with her husband, the wife was only performing the duties contemplated by marriage); Litwin v. Litwin, 375 Ill. 90, 96 (1940) (wife's promise to dismiss a suit for separation and resume marital status was not consideration for husband's assignment of half the interest in a trust deed, because wife did not have any grounds for separating from her husband, the suit was not brought in good faith, and her promise to resume marital status was something she was already duty bound to do). Courts in other states have similarly held that there is valid consideration where an injured spouse receives something of value in exchange for her dismissal of a divorce suit and resumption of marital relations, because in dismissing the suit, the injured spouse is taking an action not compelled by law. See Adams v. Adams, 91 N.Y. 381, 383-84 (N.Y. App. 1883) ("it would be a curious policy which should forbid husband and wife to compromise their differences, or preclude either from forgiving a wrong committed by the other"); Darcey v. Darcey, 29 R.I. 384, 388-89, 71 A. 595, 597 (1909); McKay v. McKay, 189 S.W. 520 (Tex. App. 1916); see also Hanner v. Hanner, 95 Ariz. 191, 193, 388 P.2d 239, 241 (1964) (parties' agreement to discontinue divorce suit and resume marital relations was consideration to support their reconciliation agreement); Chew v. Chew, 38 Iowa 405 (1874). But cf. Marshall v. Marshall, 166

W.Va. 304, 308-09, 273 S.E.2d 360, 363 (1981) (husband's giving up a meritorious claim for divorce and reconciling was not consideration for his wife's transfer of property, because he filed for divorce after receiving the property and had lived with wife only intermittently in between).

The instant case is somewhat different from Phillips and the other cases cited, in that petitioner had neither separated from respondent nor filed her dissolution petition at the time the parties signed the postmarital agreement. Still, forbearance of bringing a legal action, even for a limited period of time, is a recognized form of consideration. See Tower Investors, 371 Ill. App. 3d at 1027-29. Forbearance of bringing or prosecuting a divorce action has been directly recognized as consideration in other states, and we find no compelling reason to deviate from these authorities. See Upton v. Ames & Webb, Inc., 179 Va. 219, 227, 18 S.E.2d 290, 293 (1942); Polson v. Stewart, 167 Mass. 211, 216-17, 45 N.E. 737, 739 (1897); Duffy v. White, 115 Mich. 264, 270-74, 73 N.W. 363, 365-66 (1897); compare Bratton v. Bratton, 136 S.W.3d 595, 603 (Tenn. 2004) (where parties were not having marital difficulties at the time they entered postnuptial agreement, it was not a reconciliation agreement, and wife's promise to remain in the marriage was not consideration), and Whitmore v. Whitmore, 8 A.D.3d 371, 372, 778 N.Y.S. 2d 73, 75 (N.Y. App. 2004) (mere continuation of marriage was not adequate consideration for postnuptial agreement in which wife released claims on husband's property), with Gilley v. Gilley, 778 S.W.2d 862, 864 (1989) (Tenn. App. 1989) (where wife agreed not to prosecute a divorce action against her unfaithful husband in exchange for an agreement setting forth property distribution if the parties later divorced, wife supplied consideration, and court upheld agreement).

We recognize that in many of the aforementioned cases that found consideration in the forbearance of bringing or prosecuting a divorce, the parties were separated at the time they entered

into the postmarital agreement. However, this is not the situation in all of the cases cited (see Polson, 167 Mass. 211, 45 N.E. 737), and we believe that this is a distinction without a difference under the facts of the instant case, because it is undisputed that petitioner and respondent were having marital difficulties when they signed the agreement. Moreover, while an Illinois dissolution based on irreconcilable differences requires that the parties have either lived separately for over two years or lived apart for at least six months and waive the two-year period, petitioner could have bypassed this requirement entirely by seeking a dissolution on the ground of adultery. See 750 ILCS 5/401(a) (West 2004). Therefore, to constitute consideration, it is not logical to require separation as a prerequisite for the forbearance of filing for divorce. But cf. Fisher v. Koontz, 110 Iowa 498, __, 80 N.W. 551, 553 (1899) (where there was no separation or pending action for divorce, wife's condoning of husband's cruel conduct was not consideration for alleged oral agreement to cancel prenuptial agreement, because the parties' "adjustment of differences must be conclusively presumed to have sprung from mutual affection, the interests of home and children, and their well-being in society, and not to have been induced by greed of worldly gain").

We note that unlike in Tower Investors, in this case the agreement did not include a specific period of time in which petitioner would refrain from filing a dissolution petition. Where a contract does not specify a time for performance, a reasonable time will be implied. Rose v. Mavrakis, 343 Ill. App. 3d 1086, 1092 (2003). Similarly, an "agreement to forbear need not be in express terms or for an exact period of time; the terms may be gathered from the surrounding circumstances from which forbearance for a reasonable time may be implied." First National Bank of Red Bud v. Chapman, 51 Ill. App. 3d 738, 742 (1977). The amount of time that constitutes a reasonable amount of time is a question of fact that depends on the particular circumstances of the case, and the trial

court's finding will not be disturbed unless it is contrary to the manifest weight of the evidence. Wilmette Partners v. Hamel, 230 Ill. App. 3d 248, 257 (1992); Clay v. Harris, 228 Ill. App. 3d 475, 480-81 (1992). A finding is against the manifest weight of the evidence if the opposite conclusion is clear from the record or if the finding is unreasonable, arbitrary, and without a basis in the evidence. Lyon v. Department of Children & Family Services, 209 Ill. 2d 264, 271 (2004).

Here, the parties signed the postmarital agreement on June 15, 2004, and petitioner filed for a dissolution on November 23, 2004. In commenting on this period of time, the trial court stated, "After the execution of the agreement [petitioner] begins to look for work, finds a well-paying job, and shortly after files for divorce, seeking to enforce the agreement." This finding contributed to the trial court's ruling that the agreement was procedurally unconscionable. To the extent that this constitutes an implicit finding that petitioner did not wait a reasonable amount of time before filing for dissolution, we believe that the finding is against the manifest weight of the evidence. Petitioner waited over five months from the time the parties signed the postmarital agreement to the time she filed for dissolution. During that time, petitioner arranged for the parties to attend marital and sex counseling and took other steps to try to save the marriage. However, respondent admittedly still had contact with Meyada, the woman with whom he had an affair, and he unilaterally decided to send Mehmood a $5,000 check. According to petitioner, respondent also became verbally abusive and no longer tried to make the marriage work. Under these circumstances, a finding that petitioner did not forbear filing for a dissolution for a reasonable amount of time is against the manifest weight of the evidence. Therefore, we agree with petitioner that her forbearance of filing for a dissolution was consideration supporting the postmarital agreement.

We still need to address whether the postmarital agreement was unenforceable based on unconscionability. However, before turning to the merits of that issue, we must first resolve whether we may consider certain factual admissions made by respondent. Respondent's failure to respond to a request to admit facts related to the signing of the postmarital agreement resulted in the judicial admission of those facts. See 134 Ill. 2d R. 216(c); Moy v. Ng, 371 Ill. App. 3d 957, 960 (2007). However, respondent argues that petitioner waived the admissions because both parties presented evidence at trial regarding the circumstances surrounding the postmarital agreement. " 'Where facts have been admitted pursuant to a Rule 216 request and the party presents evidence at trial to prove those facts, the admissions are waived and the party must rely on the strength of the evidence adduced at trial.' " Hubeny v. Chairse, 305 Ill. App. 3d 1038, 1044 (1999), quoting Magee v. Walbro, Inc., 171 Ill. App. 3d 774, 780 (1988).

As petitioner points out, there were only three admissions for which controverted testimony was arguably presented at trial: (1) that respondent "voluntarily signed" the postmarital agreement; (2) that he was "not forced in any way to sign" the agreement; and (3) that he "believed the terms were fair" when he signed the agreement. Petitioner argues that it was only after respondent's attorney first elicited testimony regarding respondent's feelings during the postmarital negotiations and agreement-signing that her attorney cross-examined respondent on the subject. However, testimony brought on cross-examination can still waive the right to rely on admissions. See Rowe v. State Bank of Lombard, 247 Ill. App. 3d 686, 696 (1993); People v. Mindham, 253 Ill. App. 3d 792, 795 (1993). Petitioner also argues that it would be unjust to apply waiver when the trial court refused to rule on her motion in limine, presented at the start of trial, that related to the facts deemed admitted. The trial court stated, "I thought I already ruled on that, you know. If they're not denied,

then they're admitted. If they're not timely denied, then they're admitted. If they are facts so [sic]." In light of the fact that petitioner's counsel commented, before introducing the motion, that she was "not exactly sure that it's even needed," and the fact that the motion in limine is not in the record, it is not unjust to apply waiver here. See Foutch v. O'Bryant, 99 Ill. 2d 389, 391-92 (1984) (it is the appellant's burden to provide a sufficiently complete record of trial proceedings to support a claim of error, and the reviewing court will resolve any doubts that arise from the incompleteness of the record against the appellant). Accordingly, petitioner waived the three aforementioned admissions and may not now rely on them.

We now return to the issue of whether the postmarital agreement was unconscionable. A trial court may make a finding of unconscionability based on procedural unconscionability, substantive unconscionability, or some combination of the two. Kinkel v. Cingular Wireless, LLC, 223 Ill. 2d 1, 21 (2006). A contract is procedurally unconscionable if an impropriety in the process of forming the contract deprived a party of a meaningful choice. Kinkel, 223 Ill. 2d at 23. The trial court found that the postmarital agreement was procedurally unconscionable largely on the basis that petitioner was in Canada with Azra while the parties were negotiating the terms of the postmarital agreement, "the implicit threat being that unless agreement was reached she and Azra would remain in Canada, reducing if not eliminating [respondent's] ability to meaningfully parent."[2] This statement equates to a finding that respondent was under duress during the negotiation of the agreement. Duress may make an agreement between spouses unconscionable. In re Marriage of Richardson, 237 Ill. App.

---

[2]Although the trial court also noted that petitioner later obtained a job and filed for dissolution, these do not directly support a finding of procedural unconscionability, as they do not relate to the contract's formation.

3d 1067, 1082 (1992). Duress can consist of oppression, undue influence, or taking undue advantage of another's stress to the point where that person is deprived of the exercise of free will (Richardson, 237 Ill. App. 3d at 1082); duress and coercion have basically the same meaning (Crossroads Ford Truck Sales, Inc. v. Sterling Truck Corp., 341 Ill. App. 3d 438, 446 (2003)). Acts or threats must be legally or morally wrongful to constitute duress (In re Marriage of Barnes, 324 Ill. App. 3d 514, 519 (2001)), and duress is measured by an objective test, rather than a subjective one (Allen v. Board of Trustees of Community College District No. 508, 285 Ill. App. 3d 1031, 1035 (1996)). "The person asserting duress has the burden of proving, by clear and convincing evidence, that he was bereft of the quality of mind essential to the making of the contract." In re Marriage of Hamm-Smith, 261 Ill. App. 3d 209, 215 (1994). We review a trial court's finding of duress under a manifest weight of the evidence standard. Wermers Floorcovering, Inc. v. Santanna Natural Gas Corp., 342 Ill. App. 3d 222, 224 (2003).[3]

Richardson is an example of a case in which the appellate court found a postmarital agreement procedurally unconscionable due to duress. Richardson, 237 Ill. App. 3d at 1082. There, the wife was not represented by counsel during the initial drafts of the postmarital agreement. Richardson, 237 Ill. App. 3d at 1071. The husband's attorney later obtained a matrimonial attorney to represent the wife, but after that attorney advised the wife not to sign the agreement, the husband had his attorney obtain a new attorney for the wife. Richardson, 237 Ill. App. 3d at 1081. The new attorney was a former associate at the firm of the husband's attorney, had very little experience in matrimonial

---

[3]Where procedural unconscionability is based on contract terms and the disparity of bargaining power between the contract's drafter and the party claiming unconscionability, the issue is reviewed de novo. See Kinkel, 223 Ill. 2d at 22. However, because the procedural unconscionability in this case rests on the issue of duress, we use the manifest weight standard.

law, and was not aware that the wife had previously been represented by other counsel. The new attorney never met with the wife or sent her any documents (Richardson, 237 Ill. App. 3d at 1081-82), and the wife first saw the postmarital agreement at the meeting where she signed it (Richardson, 237 Ill. App. 3d at 1074). The meeting occurred one week after the death of the wife's father, and there was testimony that his illness and death had made her very emotional. Richardson, 237 Ill. App. 3d at 1081. The wife testified that she had thought that the meeting was just to exchange property titles, and she did not know why she had to sign the postmarital agreement so soon after her father's death. Although there was conflicting testimony regarding whether the wife cried at that meeting, it was clear that she was crying and distraught at a meeting that had occurred just 10 days earlier. Richardson, 237 Ill. App. 3d at 1082.

In contrast to Richardson, we conclude that under the facts of this case, a finding of procedural unconscionability based on duress is against the manifest weight of the evidence. In arriving at this conclusion, we are cognizant of the trial court's finding that petitioner's testimony regarding the circumstances surrounding the execution of the postmarital agreement was not credible. Still, our determination equally holds true under respondent's version of the facts. Although respondent testified that he was feeling afraid, panicky, depressed, vulnerable, and uncertain when petitioner was in Canada with Azra and they were negotiating the terms of the postmarital agreement, he also testified that he was represented by counsel regarding the agreement and that the parties made changes to the agreement between the first draft and the version that they ultimately signed. Respondent was apparently satisfied with his representation, for he initially hired the same firm to represent him in the dissolution proceedings. Respondent's access to and use of independent counsel during the formation and execution of the agreement is readily distinguishable from the wife's situation in Richardson. Furthermore, although respondent agreed to sign the postmarital agreement

while petitioner was still in Canada, he did not actually sign it until two days after she had returned with Azra. Where the parties to a contract do not intend to be bound to the agreement until it is signed, the agreement is not binding until both parties sign it. 17 C.J.S. Contracts §75 (2007). Respondent testified that he was feeling very vulnerable when he signed the agreement and was concerned that petitioner would "take off" with Azra. However, if respondent thought that petitioner was a flight risk and simply wanted to prevent her from leaving the country with Azra without his permission, he could have applied for a restraining order. Given that petitioner was in the United States with Azra when respondent ultimately signed the postmarital agreement, and that he was represented by independent counsel during the entire process, a finding of procedural unconscionability predicated on duress is against the manifest weight of the evidence.

We next examine whether the postmarital agreement was substantively unconscionable. Substantive unconscionability is based on the fairness and obligations of the contract's terms, and it can be shown by " 'contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.' " Kinkel, 223 Ill. 2d at 28, quoting Maxwell v. Fidelity Financial Services, Inc., 184 Ariz. 82, 89, 907 P.2d 51, 58 (1995); see also Richardson, 237 Ill. App. 3d at 1080 (unconscionable terms have been defined as being improvident, completely one-sided, and oppressive). We review this issue de novo. Kinkel, 223 Ill. 2d at 22. However, to the extent that we consider factual findings in our analysis, we will use a manifest weight of the evidence standard. See Best v. Best, 223 Ill. 2d 342, 350-51 (2006) (factual findings reviewed under manifest weight of the evidence standard).

The trial court found that the postmarital agreement was substantively unconscionable because it was "completely lacking in financial disclosures." We note that premarital agreements may be invalidated if they are unconscionable at the time of signing and, before the signing, the party seeking

-21-

to avoid the agreement: (1) was not provided with appropriate financial disclosures; (2) did not make a written waiver of the right to financial disclosures beyond those provided; and (3) either did not have or reasonably could not have had sufficient knowledge of the other party's financial situation. 750 ILCS 10/7(a)(2) (West 2006). We question whether financial disclosures are required in postmarital reconciliation agreements. Cf. In re Marriage of Burkle, 139 Cal. App. 4th 712, 746, 43 Cal. Rptr. 3d 181, 208 (2006) (statutes requiring financial disclosures before parties to dissolutions agreed to resolve property issues did not apply to postmarital agreements that contemplated reconciliation and were not executed in contemplation of imminent divorce). In any event, we conclude that the lack of such disclosures would not invalidate the agreement here, because the postmarital agreement states that the parties were sufficiently aware of each other's assets and liabilities and expressly waived any right to further disclosure of assets and liabilities and because respondent, against whom the agreement is sought to be enforced, admitted that he did not subsequently learn anything new about petitioner's assets.

Courts examining whether postmarital agreements are substantively unconscionable have focused on the parties' economic circumstances immediately following and resulting from the agreement. See Richardson, 237 Ill. App. 3d at 1080. Here, the parties stated in the postmarital agreement that the house had an estimated fair market value of $450,000 and an outstanding mortgage of about $350,000. Accordingly, the parties had about $100,000 in equity. By giving up his share of the marital home, respondent was therefore relinquishing his right to $50,000 in equity when he signed the agreement. By further agreeing that the home "shall not be considered in determining the Wife's assets, income or expenses for purposes of determining the percentage or portion of the marital estate that either party is to receive," respondent also lost the right to have the home's value considered as an asset of petitioner in the overall distribution of the marital estate.

The trial court found that respondent's testimony regarding his finances was not credible and that it could not properly value American Pioneer and respondent's nonmarital estate. The trial court further found that respondent's annual income was at least $85,000 and that his "true income [was] undoubtedly higher than" petitioner's. We agree with petitioner that by not providing credible evidence of his own economic circumstances, respondent could not establish the parties' relative economic circumstances or that the postmartial agreement was substantively unconscionable. The evidence before the trial court actually indicated the contrary. Accordingly, the trial court erred in ruling that the postmarital agreement was substantively unconscionable. Cf. Richardson, 237 Ill. App. 3d at 1083 (postmarital agreement unconscionable because, among other things, it awarded wife only 7.55% of assets listed on balance sheet).

Based on our determinations that the postmarital agreement contained valid consideration and was neither procedurally nor substantively unconscionable, it follows that the trial court erred by refusing to enforce the agreement. Accordingly, we remand this case to the trial court so that it may give effect to the agreement. As this requires awarding the marital home to petitioner as nonmarital property, the trial court must necessarily redistribute the remainder of the marital estate.

### B. Dissipation

Petitioner next argues that the trial court erred by limiting its specific finding of dissipation to $5,000. Dissipation is a spouse's use of marital property for his or her own benefit, for a purpose unrelated to the marriage, during a time when the marriage is suffering from an irreconcilable breakdown. In re Marriage of Hubbs, 363 Ill. App. 3d 696, 700 (2006). The question of whether a spouse has dissipated marital assets depends on the facts of the case. Hubbs, 363 Ill. App. 3d at 700. Once a prima facie case of dissipation is made, the charged spouse has the burden of showing, by clear and convincing evidence, how the marital funds were spent. In re Marriage of Murphy, 259

Ill. App. 3d 336, 339 (1994); see also In re Marriage of Manker, 375 Ill. App. 3d 465, 477 (2007). If the spouse fails to meet this burden, the trial court is required to find dissipation. Hubbs, 363 Ill. App. 3d at 701-02. We review a trial court's factual findings on dissipation under the manifest weight of the evidence standard, though we review its final property distribution under an abuse of discretion standard. In re Marriage of Vancura, 356 Ill. App. 3d 200, 205 (2005). To the extent that petitioner is arguing that the trial court was required to state an exact dollar amount of dissipation, she is raising a question of law, which we review de novo. See Lowderman, LLC, 367 Ill. App. 3d at 504 (questions of law reviewed de novo).

Petitioner argues that in addition to the $5,000 dissipation for the check written to Mehmood, the trial court should have found that respondent dissipated marital assets in the amount of $18,000 for vacations and $5,400 for medical expenses. At trial, respondent was questioned in regard to his comprehensive financial statement. He had listed $200 per month for medical expenses after insurance, and he testified that those represented costs for Viagra and drugs for a rash that he had. Respondent had also listed $1,000 per month for vacation expenses, and he testified that he had been taking trips with his girlfriend. In petitioner's written closing arguments, she argued that respondent's $1,000 per month in vacations for 18 months equaled $18,000 and that $200 per month for medical expenses equaled $3,600. We therefore will assume that the $5,400 in dissipation for medical expenses that petitioner claims on appeal is a scrivener's error. See also In re Stephen K., 373 Ill. App. 3d 7, 25 (2007) (party is estopped from taking a position on appeal that is inconsistent with that taken in trial court).

The trial court found that it was unable to "accurately calculate respondent's dissipation which is clearly larger than $5,000." Based on this dissipation, as well as other factors, the trial court awarded petitioner a disproportionate share of the marital home. A trial court is not required to list

what conduct constituted dissipation and how it arrived at a particular dollar amount. In re Marriage of Dunseth, 260 Ill. App. 3d 816, 831 (1994). Furthermore, the trial court is not required to award the other spouse cash or property equal to half of the amount dissipated. In re Marriage of Jerome, 255 Ill. App. 3d 374, 394 (1994). Even more, it is not required to directly charge the dissipated amount against the party's share of the estate. Murphy, 259 Ill. App. 3d at 340-41 (where dissipation of $7,800 did not materially affect the division of property, trial court did not abuse its discretion by not charging that amount against the husband's share of marital property). Petitioner does not cite, nor does our research reveal, any authority requiring that the trial court state an exact amount of dissipation. In the context of the distribution of the marital estate, the trial court is not required to put a particular value on each marital asset when determining the value of the property to be distributed to each spouse. In re Marriage of McHenry, 292 Ill. App. 3d 634, 638 (1997). Rather, it is necessary only that the trial court consider the value of the property distributed to each spouse and that there is sufficient evidence of value in the record to allow for review of the trial court's distribution. McHenry, 292 Ill. App. 3d at 638. In light of the fact that petitioner claimed specific amounts of dissipation, that the trial court found that respondent's dissipation exceeded $5,000, and that the trial court awarded petitioner a larger share of the marital home in part because of the dissipation, we conclude that the record allows us to fully review the trial court's award and that it was not required to list a more specific amount of dissipation.

We further conclude that the trial court's finding that respondent's dissipation totaled over $5,000 is not against the manifest weight of the evidence. It is undisputed that respondent wrote Mehmood a $5,000 check from the parties' joint account. Respondent also testified that he had $1,000 per month of expenses for vacations taken with his girlfriend, and this type of expenditure has been held to constitute dissipation. See Murphy, 259 Ill. App. 3d at 339; In re Marriage of Osborn,

206 Ill. App. 3d 588, 600-01 (1990). On remand, the trial court will have to account for respondent's dissipation in a manner that does not include a larger share of the parties' home, as we have determined that the home should be considered petitioner's nonmarital asset.

Petitioner further argues that the trial court erred in the amount of weight it gave to various factors in its division of marital assets. Respondent argues that petitioner has waived this argument by failing to cite any legal authority on this issue. See Vine Street Clinic v. Healthlink, Inc., 222 Ill. 2d 276, 301 (2006) (failure to cite to relevant authority violates Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)) and results in forfeiture of the argument). While we believe that petitioner has cited sufficient authority to preserve her argument, we do not address it because the trial court will be reapportioning the marital assets on remand.

The material in section C., regarding attorney fees, is nonpublishable under Supreme Court Rule 23.

## II. CONCLUSION

To review, we have concluded that the Du Page County circuit court erred by ruling that the postmarital agreement was invalid. We therefore reverse this ruling and remand the cause to the circuit court to give effect to the agreement and reapportion the remainder of the marital estate, keeping in mind the need to account for respondent's dissipation. We affirm the circuit court's award of attorney fees.

Affirmed in part and reversed in part; cause remanded.

O'MALLEY and ZENOFF, JJ., concur.