**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 250201-U

Order filed October 29, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| ERIN WERHUN, | ) | Du Page County, Illinois, |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-25-0201 |
| and | ) | Circuit No. 20-D-1952 |
| | ) | |
| JEFFREY WERHUN, | ) | Honorable |
| | ) | Neal W. Cerne, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Justices Hettel and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The court's refusal to restrict Jeffrey's parenting time was not against the manifest weight of the evidence. The court's finding that Jeffrey did not cohabitate is not against the manifest weight of the evidence. The court abused its discretion by not imputing income to Jeffrey. The court's valuation of Jeffrey's contribution to the marital estate was not against the manifest weight of the evidence. The record regarding the court's findings relating to dissipation was not sufficient to allow review.

¶ 2    Petitioner, Erin Werhun, appeals the Du Page County circuit court's judgment for dissolution of marriage. Erin argues that the court's failure to find that respondent, Jeffrey

Werhun, cohabitated was against the manifest weight of the evidence, the court's maintenance award to Jeffrey was an abuse of discretion, the court's valuation of Jeffrey's contribution to the marital estate was against the manifest weight of the evidence, the court's allocation of the marital estate was an abuse of discretion, and the court's allocation of parenting time was against the manifest weight of the evidence. We affirm in part, reverse in part, and remand for further proceedings.

¶ 3                                I. BACKGROUND

¶ 4        The parties were married on December 20, 2009. Erin filed a petition for dissolution of marriage on October 29, 2020. The parties had one child who was born in 2018. John Demling was appointed as the guardian *ad litem* (GAL). Erin filed a motion seeking child support. Jeffrey filed a petition seeking temporary maintenance. In February 2022, the court entered an agreed order providing for supervised parenting time for Jeffrey which included supervision by Family Solutions, Inc. Jeffrey was responsible for all costs and fees incurred for the supervised visits through Family Solutions. Jeffrey, pursuant to his petition, was awarded temporary maintenance. Erin was to pay maintenance as of May 1, 2022. She was to pay Jeffrey $1,206 per month, which was the maintenance obligation of $3,103 minus Jeffrey's child support obligation of $897 and $1,000 per month in expenses that Erin paid toward the marital property where Jeffrey was living. Pursuant to a motion by Jeffrey, Dr. Louis Kraus was appointed to perform an evaluation pursuant to section 604.10(c) of the Illinois Marriage and Dissolution of Marriage Act (Act). 750 ILCS 5/604.10(c) (West 2020),

¶ 5        Both parties filed notices of intent to file dissipation claims. Jeffrey alleged that Erin dissipated $237,079.03 in funds related to her cash withdrawals, withdrawals from a 457(b) account, and income from one of the marital properties that was not deposited. Erin alleged that

Jeffrey dissipated $478,036.61 in funds related to the sale of two properties acquired during the marriage and subsequent use of the funds obtained from those sales, his use of funds for attorney fees relating to his defense of criminal and civil matters, withdrawals from an IRA, and withdrawals from other accounts.,

¶ 6 The matter proceeded to trial in 2024. The GAL testified in narrative form, followed by questioning from each party. The GAL testified that he met with Jeffrey, his parents, his sister, and Erin. He also visited Jeffrey's home. The GAL noted that Erin had a concern with Jeffrey's drinking. Jeffrey had voluntarily attended treatment to address his use of alcohol, depression, and anxiety. The GAL noted that although there had been supervised visitation for Jeffrey, he had recently recommended non-supervised visitation, provided that Jeffrey used SoberLink. However, the parties could not agree to this, and the visits remained supervised. The GAL testified that, in his opinion, both Jeffrey and Erin were good parents. The GAL stated that he had reviewed Dr. Kraus's report and, for the most part, agreed with his recommendations and observations.

¶ 7 The GAL noted that Erin still had significant concerns regarding Jeffrey's drinking prior to and during his parenting time. The GAL testified as to Jeffrey's criminal matters and that subsequent to the conduct giving rise to those matters, Jeffrey obtained treatment. The GAL noted that there were no negative issues during Jeffrey's supervised visitation and the supervised visitations had gone well. There was also no indication that Jeffrey was impaired during any of the supervised visits. The GAL recommended that Jeffrey be awarded unsupervised parenting time two nights a week for two-to-four hours. He also recommended alternating weekends. The GAL recommended the use of SoberLink during the alternating weekends for a period of time. The GAL specifically stated that SoberLink "should be used to assuage the concerns that" Erin

3

has. The GAL also testified that he saw "no reason to restrict the parenting time" of Jeffrey. He believed that for at least one year prior to his testimony, it was no longer necessary to have restrictions on Jeffrey, as long as Jeffrey utilized SoberLink during overnights or extended periods of parenting time.

¶ 8 When the GAL finished his narrative, the court noted that section 603.10 Act (750 ILCS 5/603.10 (West 2024)) provided that a court can restrict parenting time if alcohol use interferes with a parent's ability to perform caretaking functions for the child and that the GAL had recommended a restriction based upon alcohol use. The court then asked the GAL if Jeffrey's alcohol use had interfered with his ability to perform caretaking functions for the child. The GAL stated that part of his "recommendation was, for lack of a better term, to assuage the concerns that" Erin had. The GAL indicated that he was not certain that fell within the four corners of section 603.10. The GAL then testified that he was not sure that he had seen evidence that Jeffrey's alcohol use directly affected his ability to care for the child. The GAL also noted that Jeffrey had been voluntarily using SoberLink at Dr. Kraus's suggestion. In response to a question by Jeffrey's counsel as to whether the GAL had any concerns about Jeffrey and alcohol usage, the GAL replied, "[w]ould I prefer that he not drink at all, yes. Do I think that his drinking has any negative effect on his ability to parent while he has parenting time, no."

¶ 9 A friend of Erin's testified that Jeffrey's girlfriend, Jorie Taylor, was running a safe haven for battered women on the property where Jeffrey was living. The friend learned this information from social media.

¶ 10 Erin testified that when she and Jeffrey got married, Jeffrey was working as a consultant for his father's company. He continued in that position through 2016 or 2017, and he earned approximately $100,000 per year. After that time, Erin testified that if Jeffrey was earning any

income, "it was minimal through the rental properties that" they owned. Erin worked as a radiologist but was terminated in 2020. She went on disability due to an autoimmune disease. She receives approximately $11,000 per month for her disability. Erin testified that during the course of their marriage, Jeffrey would binge drink two-to-four times per week. She stated that Jeffrey had sought help for alcohol consumption multiple times during their marriage, including shortly after they separated in 2020. Erin also testified that Jeffrey smoked marijuana six-to-eight times per day during their marriage. In 2022, Jeffrey took their child to a baseball game. Erin testified that when they returned from the game, Jeffrey was not driving, his gait was unsteady, his eyes were dilated, and he smelled of alcohol. Erin stated that she has concerns with Jeffrey having unsupervised visits with their child. Her primary concern is Jeffrey's use of marijuana prior to driving and his alcohol use, despite having been treated and hospitalized various times for his alcohol use. Erin testified that she had seen Jeffrey with Jorie at the bar and leaving Jeffrey's house. She had also seen Jorie driving one of the marital vehicles and bringing groceries into Jeffrey's house.

¶ 11    Erin testified that after the parties separated, she moved $62,775 from a joint account to her personal account. She believes she left a couple hundred dollars in the joint account. Erin made numerous cash withdrawals. Generally, she testified that these withdrawals were to pay living expenses, the mortgages on the various marital properties or to make repairs and maintain the properties. She generally did not have receipts or documentation to support her testimony regarding the expenditures. As to one of the marital properties, the Belmont property, Erin testified to receiving rental income from that property and using rental income to cover expenses. She transferred the rental income from a joint account to her personal account and then used her personal account to pay the mortgage.

¶ 12    The court took judicial notice of an appellate court decision from Jorie's divorce case. In that order, the court noted that the trial court had entered a default judgment which found that Jorie was barred from maintenance because of her continuing and conjugal cohabitation with a significant other. See *In re Marriage of DuMortier*, 2024 IL App (1st) 232202-U, ¶ 17.

¶ 13    Jeffrey testified that he resided at 2521 Maple Avenue in Downers Grove. Jeffrey stated that he was working as a baseball coach and had been for two years. Jeffrey coached for 10 to 20 hours per week. He earned $5,000 per season to be a head coach. The baseball season lasts four or five months. Jeffrey stated that he used to provide private lessons as well. He earned $65 per hour for private lessons. Jeffrey testified that the coaching job was not his only source of income. He also traded stocks and cryptocurrency online. In 2023, Jeffrey stated that his gross income was $25,000. He also stated that he was prevented from working full time because he was just getting over his depression, anxiety and posttraumatic stress disorder. Jeffrey previously worked in real estate. He was the sole member of an LLC. He bought properties, refurbished them and either rented or sold them. The LLC was started after the marriage. Jeffrey consulted for his father's company until 2016 or 2017 and earned approximately $100,000 per year. When he was operating the LLC, he earned approximately $50,000 from the properties he owned. The LLC owned two properties, one on Elinor in Downers Grove and one on Cermak in Broadview. The money to purchase the Elinor property came from a loan from his father. He purchased that property for $64,800. He used the equity in the Elinor property to purchase the Cermak property. Those properties were sold in either 2021 or 2022 and the proceeds put into the LLC's bank account. The bank account had a balance of $153,862 in October 2022. Jeffrey withdrew the funds and put them in his personal account. He stated that those funds were no longer in the account because he used the funds for living expenses.

6

¶ 14    Subsequent to separating from Erin, Jeffrey had multiple criminal cases and one civil case filed against him. One of the criminal incidents arose out of damage Jeffrey caused to a cigar club. Jeffrey retained counsel to defend him. He stated that he paid one attorney approximately $20,000 and the other attorney $3,000 to $5,000. At another time in his testimony, Jeffrey stated that he paid one of the attorneys $35,000 and the other $6,000. Additionally, he paid $3,500 to the cigar club and $37,000 to an insurance company for the damage at the cigar club.

¶ 15    Jeffrey was on probation for one of the criminal cases and one condition of probation was to not drink alcohol. Jeffrey testified that he stopped drinking alcohol when he entered his plea agreement for probation, which was in November of 2022. Jeffrey was impeached with his deposition testimony, during which he stated that he was drinking once every few days. In response, Jeffrey testified that he misunderstood the time period counsel was asking him about during his deposition. Jeffrey stated that he had not been drinking alcohol for two years. Any charges on his credit card for alcohol would be for other people. Jeffrey testified that he is on medication for anxiety, and he sees a psychiatrist every two months. He testified that he uses medical marijuana. Jeffrey has been hospitalized a few times due to his depression and alcohol use. He has used SoberLink voluntarily and all of the tests have been negative for alcohol. Jeffrey testified that at the time of trial he was no longer drinking. Jeffrey has not had any hospitalizations or other incidents since 2021 and has been following the recommendations of his doctors.

¶ 16    Jeffrey testified that he had been dating Jorie, but they broke up a few weeks before his testimony. They had dated for approximately two years but had broken up various times during that period. Jeffrey had not considered marrying Jorie. She did not reside with him. Jorie would

7

stay at his house once in a while and sometimes three or four nights. Jorie also stayed with her mom sometimes and with her dad for long periods of time. Jeffrey stated that Jorie also stayed with a friend sometimes. Jeffrey testified that he did not have plans to introduce Jorie to his son and she had never met his son. Jorie had a key to Jeffrey's house for emergencies, but he believed she lost the key. Jeffrey stated that Jorie was generally not at his house unless he was with her. Jeffrey let Jorie use one of the marital vehicles a handful of times over the two years they dated. Jeffrey testified that he and Jorie did not have joint bank accounts and did not name each other on their accounts. Jorie was not a beneficiary on any of his accounts. Jeffrey and Jorie did not pay bills together and he did not pay for anything for Jorie, except for dates. He stated that he and Jorie only took one trip together and that was for a family wedding. Jeffrey stated that they did not buy gifts for each other for birthdays or Christmas. He did not have any joint financial accounts with Jorie, such as a credit card, and did not own anything jointly with her. Jorie did not contribute to his household expenses, but she sometimes bought food that she liked to have at his house.

¶ 17        Corporal Kaefer testified that he was a patrol officer with the Du Page County sheriff's office. In June 2024 he was called to 2521 Maple Avenue in Downers Grove for a welfare check on Jorie. Kaefer put Jorie's address as 2521 Maple Avenue in his report. He obtained that address by doing a web RMS inquiry for Jorie. He stated that by doing that inquiry he believed he found Jorie's "father's address where she's known to live at." He testified that he put the Maple address "because her father stated she's been living with him for a year. So I concluded that's her address."

¶ 18        Jeffrey's father, Jaroslaw Werhun, testified that his company loaned about $82,888 in Canadian dollars to Jeffrey so Jeffrey's LLC could purchase the Elinor property. However, the

8

court ultimately struck any reference to the loan because it would be a marital debt, and Jeffrey had not previously alleged it to be a marital debt. Jaroslaw testified that he supervised some visits between Jeffrey and his child. He stated that Jeffrey was excellent at handling his child and there were no concerns with his parenting. Jaroslaw testified that although Jeffrey went through some hospitalizations, the medications seemed to have worked well for him and that he was more stable. When Jaroslaw was visiting Jeffrey in 2023 for five or six days, he saw Jorie twice. He stated that Jorie was not living with Jeffrey, and he did not see any female clothing or toiletries in Jeffrey's house. He did not know Jorie well and only had superficial conversations with her. Jaroslaw testified that Jeffrey had an employable skill set that could be used to obtain employment if Jeffrey was healthy, but he did not believe he was at that time. He stated that Jeffrey was not using alcohol. Jeffrey did not consume alcohol during a family wedding. Jorie attended the family wedding with Jeffrey. Jorie did not attend any family holiday celebrations.

¶ 19      Jeffrey's sister, Ashley Werhun, testified that she was approved to be a supervisor for Jeffrey's visits with the child and she supervised a visit in 2022. She did not observe Jeffrey consuming alcohol during that visit. She did not have any concerns with Jeffrey's parenting and Jeffrey took care of all of the child's needs.

¶ 20      Sean Osborne testified that he runs a travel baseball organization and that Jeff worked for him. He stated that Jeffrey is paid $6,000 per year and works approximately 20 hours per week. Osborne testified that he had not received any complaints from parents regarding Jeffrey. He has never seen a problem regarding alcohol for Jeffrey. Osborne was not aware of any of Jeffrey's criminal matters, but it did not concern him because of what he saw from Jeffrey working with the kids and because those incidents were prior to Osborne meeting Jeffrey. He did not have any

9

concern about leaving Jeffrey alone with the kids. Osborne stated, "he is left alone with my own son, so, I mean, I feel like that kind of says it all right there."

¶ 21     Two individuals from Family Solutions who supervised visits between Jeffrey and the child testified. Neither of these individuals found anything concerning regarding Jeffrey's parenting during the visits.

¶ 22     Dr. Kraus testified and his report was admitted into evidence. He noted that Jeffrey's psychiatrist diagnosed Jeffrey with alcohol use disorder that was mostly in remission. Dr. Kraus recommended that Jeffrey use SoberLink during his time with the child. He recommended that Jeffrey not drink and noted that the risk of relapse would be higher if he was drinking. He met with Jorie during his evaluation because she was in a relationship with Jeffrey. In his report he noted that they lived together but he did not mean that she had moved in with Jeffrey, rather that she was spending a lot of time at his place. He did not get the impression that Jeffrey and Jorie were about to be engaged. Dr. Kraus was asked if he had seen any danger to the child by Jeffrey and he replied, "No. *** there isn't anything that looked at risk." He testified that his opinion is not that Jeffrey is a serious danger to the child and has "not presented as an acute risk of harm." Jeffrey gave Dr. Kraus copies of the SoberLink reports. Upon questioning from the court, Dr. Kraus testified that the recommendation for Jeffrey not to drink and for the use of SoberLink was for Jeffrey's own benefit, as he is at risk for relapse both for his depression and alcohol use. Additionally, he testified that he made what he thought were conservative recommendations and that he hoped Erin would see the recommendations "and it would allow the potential for an agreement and not have to continue on with the trial."

¶ 23     Following trial, Erin submitted a written closing argument. She argued that Jeffrey dissipated $427,227.57 in marital funds. Erin argued that Jeffrey dissipated the funds from the

10

sale of the Elinor and Cermak properties. She argued that although Jeffrey claimed he spent the funds on living expenses, the sum that was spent well exceeded his actual living expenses. She noted he spent some of those funds on his criminal matters, which were not related to the marriage. Erin argued that Jeffrey was voluntarily underemployed. She argued that the court should impute an income of $100,000 per year to Jeffrey.

¶ 24     The court entered a judgment for dissolution of marriage. The court listed the Elinor and Cermak properties as marital property. The court found that the money provided by Jeffrey's father for the purchase of the Elinor property was a gift to Jeffrey. The court noted that Jeffrey spent approximately $10,000 to pay for the supervised visitation with his child. The court found that the parties contributed equally to the marriage, except for the $82,000 Jeffrey contributed for the purchase of the Elinor property. As to dissipation, the court stated that each party had a significant decrease in income which had forced the selling of real estate and the use of marital assets to support themselves. The court noted that Jeffrey provided extensive evidence of his monthly credit cards to explain his use of the money. The court stated that Erin provided only her testimony to support her expenses and offered no testimony on the usage of numerous cash withdrawals of approximately $14,000. The court found that Erin has a better ability than Jeffrey to acquire future assets. The court found that there was no cohabitation by Jeffrey. It stated that a mere dating relationship is not cohabitation. The court stated, "There was no showing that Jeffrey jointly owned property with Jorie, that they commingled their assets, that they held each other out as a married couple, or held any asset jointly." Additionally, the court noted that the mere fact of living together does not rise to the level of cohabitation. The court found that neither party was employed commensurate with their ability. The court found that while Jeffrey was not on disability, he was suffering from depression. The court stated that Jeffrey "certainly has the

11

ability to supplement his income with additional employment or even different employment." For maintenance purposes, using the date the petition for dissolution of marriage was filed, the court found the length of the marriage to be 10 years and 10 months. The court found that Jeffrey's income was $15,000 per year and Erin's was $135,000 per year. It stated that the statute on maintenance would suggest a maintenance award of $3,482.62 for 4.75 years.

¶ 25        As to parenting time, the court noted that nothing had occurred that justified Jeffrey's parenting time being supervised. The court found that Jeffrey suffered from severe depression and anxiety and that his alcohol and/or marijuana use could interfere with his parenting responsibilities, but that Jeffrey had taken significant steps to address his mental health and alcohol usage. The court found that these issues were not significant enough to pose an endangerment to the child. Therefore, the court found that there was no need to restrict Jeffrey's parenting time. It noted that no issues occurred during any supervised visitation and that neither the GAL nor Dr. Kraus could state that Jeffrey's alcohol usage posed an endangerment to the child. The court also stated that there was no evidence indicating that Jeffrey's alcohol usage, even if it continued, impaired his ability to care for the child. The court noted that Jeffrey went to rehabilitation and showed no signs of relapse. The court also noted that Dr. Krause opined it was in Jeffrey's best interest not to drink but that his alcohol consumption did not create endangerment for the child.

¶ 26        The court ordered Erin to pay Jeffrey $3,482.62 as reviewable maintenance for five years and provided that Jeffrey had the burden of filing a motion prior to the expiration seeking an extension. The court noted that a major factor to be considered upon review was the attempts to secure stable higher paying employment. The court noted it was deviating from the guidelines primarily because both parties were receiving income below their potential. The court stated that

12

the award was not retroactive to the date of the temporary maintenance order, which meant Erin did not get credit for payments made under the temporary maintenance order, primarily because Erin ceased making payments in June 2024. The court allocated Jeffrey unsupervised parenting time with no restrictions. Erin appeals.

¶ 27                                     II. ANALYSIS

¶ 28                          A. Allocation of Parenting Time

¶ 29        Erin argues that the court's allocation of parenting time is against the manifest weight of the evidence. Specifically, she argues that Jeffrey's risk of relapse due to his alcohol use disorder is an endangerment to the child, which warrants restrictions on his parenting time. Additionally, she argues that the allocation of parenting time fails to consider the best interests of the child. Both arguments concern the court's failure to require Jeffrey to use SoberLink to confirm his sobriety during his parenting time. Therefore, Erin is not challenging the allocation of parenting but instead the court's failure to restrict Jeffrey's parenting time. See *In re Marriage of Hipes*, 2023 IL App (1st) 230953, ¶ 36 (explaining the difference between allocating parenting time and restricting parenting time and explaining that "[a] restriction on parenting time is a limitation or condition placed on parenting time once parenting time has been allocated").

¶ 30        "Restricting parenting time requires a showing, by a preponderance of the evidence, that a parent engaged in conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development." *Id.* "Restricting parenting time under section 603.10 [of the Act] is a two-step process" and during the first step the circuit court "must determine whether the parent's conduct seriously endangered the child." *Id.* ¶ 43. We review the court's determination regarding serious endangerment under the manifest weight of the evidence standard. *Id.* "A finding is against the manifest weight of the evidence

13

when an opposite conclusion is clearly apparent or when the finding appears to be unreasonable, arbitrary, or not based on the evidence." *In re Tas. C.*, 2019 IL App (3d) 190236, ¶ 19.

¶ 31          Here, although the GAL and Dr. Kraus both recommended the use of SoberLink, upon further questioning by the court, the GAL indicated that the recommendation was meant to assuage Erin's concerns. Dr. Kraus indicated it was to help the parties come to an agreement. Dr. Kraus also indicated it was for Jeffrey's benefit. The GAL testified that he did not think that Jeffrey's drinking had any negative effect on his ability to parent when he had parenting time. Further, Dr. Kraus testified that he had not seen any endangerment to the child by Jeffrey. Additionally, none of the individuals who supervised Jeffrey's visits with the child indicated any problems during the visits. Jeffrey's boss testified that he had not had any concerns with Jeffrey drinking and even trusted Jeffrey with his own child. Jeffrey's father and sister both testified that Jeffrey appropriately cared for the child and did not consume alcohol while caring for the child. Additionally, testimony showed Jeffrey had not been hospitalized in relation to his alcohol use or depression in over two years and was in treatment. Essentially, Jeffrey had not had any relapses in years and was actively working to prevent any relapses by remaining in treatment. Further, while Jeffrey did not submit his SoberLink reports into evidence, he testified they were all negative for alcohol and Dr. Kraus testified that he had reviewed some SoberLink reports. Jeffrey had voluntarily utilized SoberLink at Dr. Kraus's recommendation. Based upon all of this evidence, we cannot say that the court's determination that Jeffrey's conduct did not seriously endanger the child was unreasonable, arbitrary or not based upon the evidence. Thus, it was not against the manifest weight of the evidence. As there was no finding of serious endangerment, the court could not impose any restrictions on Jeffrey's parenting time, such as the use of SoberLink. See 750 ILCS 5/602.7(b) (providing that "the court shall not place any restrictions on

14

parenting time" unless it makes a finding of serious endangerment); *Hipes*, 2023 IL App (1st) 230953, ¶ 37 (indicating that the requirement that a father engage in SoberLink breath alcohol testing was a restriction on his parenting time). We therefore affirm the circuit court's allocation of parenting time to Jeffrey without restrictions.

¶ 32                                    B. Maintenance

¶ 33      Erin argues that the court's failure to find that Jeffrey cohabitated is against the manifest weight of the evidence. She argues that Jeffrey and Jorie's relationship rose to the level of a *de facto* marriage despite the fact that they did not commingle financial assets.

¶ 34      To establish that a party is in a resident, continuing, conjugal relationship for the purposes of terminating maintenance, "one ex-spouse must show that the other is involved in a *de facto* husband and wife relationship with a third party." *In re Marriage of Sunday*, 354 Ill. App. 3d 184, 189 (2004). An intimate dating relationship is not a *de facto* marriage. *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 51. "Intimate dating relationships have companionship and exclusive intimacy, whereas marriage-like relationships, while likewise having companionship and exclusive intimacy ***, also have a deeper level of commitment, intended permanence, and, unless reasonably explained, financial or material partnership (which would most commonly come in the form of a shared household)." *Id.* ¶ 61. "[A] court of review will not disturb the trial court's determination concerning the existence of a *de facto* husband-wife relationship unless that determination is contrary to the manifest weight of the evidence." *Sunday*, 354 Ill. App. 3d at 189.

¶ 35      Based upon all of the evidence, it was not unreasonable or arbitrary for the court to determine that Jeffrey and Jorie did not cohabitate. Jeffrey testified that they held no assets together and had not commingled their finances. Jeffrey had not introduced his child to Jorie and

15

had no intention of doing so. Jeffrey also testified that he and Jorie had only taken one trip together and that was for a family wedding. Additionally, he testified that they had broken up various times over the two-year period they dated. Notably, Dr. Kraus testified that he did not get the impression that Jeffrey and Jorie were about to become engaged. Further, Jeffrey's father indicated that he did not know Jorie well and only had superficial conversations with her. This evidence is sufficient to lead to the conclusion that Jeffrey and Jorie did not join their finances, hold any assets together, build relationships with each other's families, plan a future together, or hold each other out as husband and wife. Thus, the evidence showed that their relationship was, at most, an intimate dating relationship rather than a *de facto* marriage. See *e.g.*, *In re Marriage of Culm*, 2025 IL App (1st) 240566, ¶ 98. Consequently, we cannot say that the court's determination that Jeffrey and Jorie did not cohabitate was against the manifest weight of the evidence.

¶ 36    Erin argues that the circuit court's award of maintenance was an abuse of discretion. Specifically, she argues that the award was excessive because it failed to impute income to Jeffrey, did not promote the goal of maintenance, and failed to credit Erin for payments made under the temporary maintenance order.

¶ 37    "A trial court's decision as to maintenance will not be reversed on appeal absent an abuse of discretion." *In re Marriage of Donovan*, 361 Ill. App. 3d 1059, 1062 (2005). "[I]t is not for this court to reweigh the statutory factors, and absent an abuse of discretion, we will not substitute our judgment for that of the trial court." *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 80. "Under the abuse of discretion standard, the question is not whether this court might have decided the issue differently, but whether any reasonable person could have taken the

16

position adopted by the trial court." *In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 708 (2006).

¶ 38        A court may impute income to a party who is voluntarily underemployed. *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 39. The decision of whether to impute income is reviewed for an abuse of discretion. *Id.* "The amount of income imputed by the court must be supported by evidence showing that it is commensurate with the supporting parent's skills and experience." *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 46. When determining the amount of income to impute, the court may consider a party's income from prior employment but "a court should not base its income calculation on outdated data that no longer reflect prospective income." *Id.* ¶ 47. "Evidence that [a party] once earned a certain salary and presumably could again is an insufficient basis upon which to impute income." *Id.*

¶ 39        Here, there was no evidence that Jeffrey had any physical impairment preventing him from working. Although there was evidence that Jeffrey suffers from depression and anxiety, there was no evidence that such conditions prevented him from working full time. Additionally, the court specifically found that Jeffrey had the ability to supplement his income with additional or different employment. Based on these facts, we conclude that the court abused its discretion by not imputing income to Jeffrey. However, there was insufficient evidence to impute income to the level Erin had requested, as she simply based her request on his prior earnings and skill set without any evidence that similar employment with a comparable salary was currently available to Jeffrey. However, at a minimum, the court should have imputed some income to Jeffrey above the $15,000 per year that the court found Jeffrey earned. The total amount of income utilized in the maintenance calculation for Jeffrey should be commensurate with, at a minimum, a forty-hour work week at minimum wage. This amount would be comprised of the income Jeffrey

17

actually earned and imputed income. We therefore remand the matter for the court to recalculate maintenance after imputing income to Jeffrey.

¶ 40    Erin also generally argues that the maintenance award was improper because it does not promote the goal of maintenance. See *In re Marriage of Cantrell*, 314 Ill. App. 3d 623, 628 (2000) ("The policy underlying rehabilitative maintenance is to sever the financial ties between a former married couple in an expeditious, but just, manner and make each spouse independent of the other as soon as practicable."). However, the court's order shows that the court considered the required statutory factors in deciding to award maintenance. Erin does not challenge any specific findings by the court regarding the factors. Additionally, the court stated that the major consideration at any maintenance review would be the attempts to secure higher paying employment. Although we agree that Erin's attempts at higher paying income are irrelevant to considerations of whether Jeffrey should continue to receive maintenance, Jeffrey's attempts would be highly relevant to the goal of him becoming financially independent. Thus, it is clear the court was considering that goal in awarding maintenance. As to the minor deviation in length of maintenance from the statutory calculation of 4.75 years to 5 years, the court noted that it did so primarily because both parties were earning less than their potential. In light of the court's consideration of the appropriate factors and its reasoning for the duration of the maintenance award, we cannot agree with Erin that the maintenance award was excessive because it failed to promote the goal of maintenance.

¶ 41    Finally with regard to maintenance, Erin argues that the maintenance award was excessive because it failed to credit her for payments made under a temporary maintenance order. The relevant statute states, "In the discretion of the court, any term of temporary maintenance paid by court order under Section 501 may be a corresponding credit to the duration

of maintenance." 750 ILCS 5/504(b-1)(1.5) (West 2024). Here, the court stated that its decision to not give credit for the temporary maintenance was primarily because Erin had stopped making the temporary maintenance payments in June 2024. In light of the court's stated reasoning and Erin's failure to provide any relevant case law in this regard, we cannot say that the court's decision was an abuse of discretion.[1]

¶ 42                                C. Allocation of the Marital Estate

¶ 43        Erin next argues that the court's valuation of Jeffrey's contribution to the marital estate was against the manifest weight of the evidence. Specifically, she argues that the court erred by finding that Jeffrey contributed $82,000 to the marital estate for the purchase of the Elinor property but also notes that it was unclear what effect, if any, that valuation had on the allocation of the marital estate. Erin argues that there was no evidence as to the amount of the alleged loan and that the testimony relating to it was stricken. Additionally, she argues that there was no evidence that the money given by Jeffrey's father was a gift, or that it was a gift to Jeffrey instead of the marriage. However, Erin wholly fails to cite any legal authority to support her position, and we thus could consider this argument forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (providing that argument must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities" and that "[p]oints not argued are forfeited"); *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 29 ("A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented; this court is not a repository into which an appellant may foist the burden of argument and research.").

---

[1]We note that Erin's opening brief improperly cited an unpublished order from 2013—*In re Marriage of Hardy*, 2013 IL App (4th) 130027-U—in support of her argument. See Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025). However, she fails to provide any argument in regard to that case, a pincite, or parenthetical to direct this court's attention to how that matter is relevant, even if it could be properly cited.

Regardless, despite all of her arguments, it is unclear what relief Erin is seeking through this argument,[2] especially considering that she states it is unclear what effect this finding by the court had on the allocation of the marital estate. Further, the court listed both the Elinor and Cermak properties as marital assets. In addition, we note that there was testimony by Jeffrey's father that he provided Jeffrey $82,880 Canadian dollars. Although the testimony indicating this money was a loan was stricken, that ruling was in relation to the court not allowing Jeffrey to claim it as a marital debt. It does not appear that the court struck testimony that the money was provided to Jeffrey by his father. Additionally, Jeffrey testified his father loaned him money and although there was no objection at that time, the court appears to have refused to consider the reference to it being a loan, corresponding with its ruling striking the references to the loan in Jeffrey's father's testimony. As the loan references were stricken, the remaining evidence showed that Jeffrey's father provided him money and in that situation donative intent is presumed. See *e.g.*, *In re Marriage of Blunda*, 299 Ill. App. 3d 855, 866 (1998) ("Donative intent is presumed where the transfer of property is from a parent to a child."). Thus, there is evidence and case law supporting the court's finding of a gift to Jeffrey, which he contributed to the marital estate.

¶ 44 Erin argues that the court erred by failing to find dissipation by Jeffrey. Specifically, she argues that Jeffrey dissipated the money he obtained and spent from the sale of the Elinor and Cermak properties. She argues that his spending on alcohol and extensive socializing was so selfish and excessive that it was improper and should be considered dissipation. Erin further argues that Jeffrey's expenditures related to the defense of his criminal matters and the damage to the cigar club were dissipation.

---

[2]We note that in her reply she states that any credit to Jeffrey against the marital estate for the $82,000 was against the manifest weight of the evidence; however, there is no indication the court gave him such a credit.

¶ 45    Dissipation is "the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown." *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 203 (2005). "Whether a given course of conduct constitutes dissipation depends upon the facts of the particular case; a spouse does not dissipate when spending marital assets for legitimate family expenses and necessary and appropriate purposes." *In re Marriage of Carter*, 317 Ill. App. 3d 546, 551 (2000). "The spouse charged with dissipation has the burden of proving, through clear and specific evidence, how the marital funds were spent." *In re Marriage of Schneeweis*, 2016 IL App (2d) 140147, ¶ 37. "Expenditures for attorney fees out of marital assets is a dissipation of marital assets." *In re Marriage of Weiler*, 258 Ill. App. 3d 454, 464 (1994). A determination as to whether dissipation occurred is reviewed using the manifest weight of the evidence standard. *Vancura*, 356 Ill. App. 3d at 204.

¶ 46    Here, the court did not make many specific findings regarding dissipation. It noted that both parties had claimed dissipation and both parties were using marital assets to support themselves. The court found that Jeffrey had little income and was forced to sell assets to support himself. Further, the court stated that Jeffrey had provided credit card receipts to show how the money was spent. As to Erin, the court found that she did not provide evidence, other than her testimony, as to her expenses and no evidence as to some cash withdrawals. The court further noted both parties spent money on attorney fees and court costs. The court did not expressly find dissipation by either party or that any dissipation had occurred. As the court made no express finding of dissipation, it likewise failed to place a value on any dissipation by either party. Although the court is not required to make such valuation there needs to be a sufficient record to allow for review. See *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 779-80 (2007).

21

Essentially, due to the lack of specific findings, we cannot determine from the record (1) if the court found dissipation by either party or both, (2) if it was both, whether the court found the amounts dissipated by each party were relatively equal and offset one another or whether the dissipation was accounted for in the allocation of the marital estate,[3] or (3) if it was one party, whether that was accounted for in the allocation of the marital estate. As such, we cannot properly review the court's findings as to dissipation and the effect of such findings on the allocation of the marital estate. We therefore remand the matter to the trial court to make express findings regarding dissipation and, if necessary, adjust the allocation of the marital estate in light of the dissipation findings, if necessary. In doing so, we conclude that there was a sufficiently clear record to determine that Jeffrey dissipated marital funds through the payment of attorney fees for his criminal matters and the payments he made to the cigar club and insurance company for the damage he caused. It would be against the manifest weight of the evidence for the court to have failed to find dissipation in this regard. Again, we note that because the court's judgment lacked express findings regarding dissipation, it is possible the court considered this dissipation by Jeffrey. We simply cannot tell from this record.

¶ 47    Erin argues that the allocation of the marital estate was an abuse of discretion. She first argues that her contribution to the marital estate for the mortgage payments she made on three of the marital properties was not considered. Erin further argues that the court failed to consider the dissipation by Jeffrey. She also argues that the court improperly considered a contribution to the marital estate by Jeffrey because there was no evidence to substantiate a gift to Jeffrey or his contribution of any gift to the marital estate.

---

[3]This seems to be the most likely conclusion reading the court's judgment, but this is still unclear, and we decline to engage in speculation.

¶ 48    A court's allocation of marital property will not be disturbed absent an abuse of discretion. *In re Marriage of Albrecht*, 266 Ill. App. 3d 399, 402 (1994). Here, we have already concluded that the matter must be remanded for the court to consider and make findings regarding dissipation. In doing so, it is possible that the overall allocation of assets could change. Additionally, we have already considered the court's finding that Jeffrey contributed to the marital estate by way of a gift from his father in paragraph 43 *supra*. In that paragraph we note testimony which would support a finding by the court that it was Jeffrey that brought money into the marital estate in order to purchase the Elinor property. Additionally, although Erin paid the mortgages for the various properties after the parties separated, Erin has not identified in her brief what funds were used to pay those mortgages, such that it is not clear that non-marital funds were utilized. If Erin used marital funds to pay the marital debt there would be no reason to consider this a contribution by Erin. This is most apparent with the marital property that was being rented rather than lived in by either party. The rental income would clearly be marital income and would be used to pay the mortgage. As such, Erin has not shown an error by the court in this regard.

¶ 49    In sum, we affirm the court's refusal to place restrictions on Jeffrey's parenting time. We reverse the court's award of maintenance and remand for the court to recalculate the amount of maintenance after imputing income to Jeffrey.[4] Additionally, we remand the matter for the court to make specific findings as to dissipation that are consistent with this opinion and for the court to reconsider its allocation of the marital estate, if necessary, based upon its dissipation findings.

_____

[4]We note that Jeffrey made some arguments of error by the court, including the court's failure to award him an amount for the maintenance that Erin failed to pay under the temporary maintenance order. However, Jeffrey has not filed a cross-appeal and thus, we do not address these contentions of error. See *Stevens v. Village of Oak Brook*, 2013 IL App (2d) 120456, ¶ 41 ("[I]n the absence of a cross-appeal, a reviewing court is confined to those issues raised by the appellant and will not consider those urged by the appellee.").

¶ 50                           III. CONCLUSION

¶ 51         The judgment of the circuit court of Du Page County is affirmed in part, reversed in part

and remanded for further proceedings.

¶ 52         Affirmed in part and reversed in part.

¶ 53         Cause remanded.